**PENNINGTON SEED, INC., Appellant,**

v.

**UNITED STATES of America.**

No. 92–5179.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 22, 1993.

Decided Dec. 3, 1993.

Walter A. Smith, Jr., with whom Gary Jay Kushner, Washington, DC, was on brief, for appellant.

Thomas S. Rees, Asst. U.S. Atty., with whom J. Ramsey Johnson, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, DC, were on brief, for appellee.

Before: SILBERMAN and RANDOLPH, Circuit Judges; FRANK M. COFFIN,* Senior Circuit Judge, United States Court of Appeals for the First Circuit.

Opinion for the Court filed by Senior Circuit Judge COFFIN.

COFFIN, Senior Circuit Judge.

The Secretary of Agriculture required appellant Pennington Seed, Inc., to destroy or dispose of grass seed shipments that contained a "noxious weed" banned by one of two federal statutes governing seed importations. In this lawsuit, Pennington claims that the shipments fell under the jurisdiction of (and were permitted by) the *other* seed statute, that the destruction order therefore was unauthorized, and that the government is obligated to compensate the company for its losses. The district court upheld the Secretary's action, and granted summary judgment for the government. Our review of the record and relevant statutes persuades us that that decision must be reversed.

I. *Statutory Background*

The Secretary of Agriculture regulates the importation of seeds through two different statutes. The first, the Federal Seed Act (FSA), 7 U.S.C. §§ 1551–1611, was enacted in 1939. It imposes, *inter alia*, detailed truth-in-labeling requirements on shipments of "agricultural or vegetable seeds," *id.* at § 1562, and also bars entry into the United States of any such shipment containing "noxious-weed seeds," *id.* at § 1581(a)(1). The FSA defines "noxious-weed seeds" as nine named seeds and any others that "after in-

vestigation the Secretary of Agriculture finds should be included," *id.* at § 1561(a)(9)(B). Before a seed may be added to the FSA's "noxious-weed" list, the Secretary must provide opportunity for notice and comment and hold a public hearing. *See id.* at § 1592(c). No seeds beyond the original list of nine have been so designated. *See* 7 C.F.R. § 201.108 (1993). The noxious-weed seed found in Pennington's shipments, "serrated tussock" (also known as *Nassella trichotoma*), is not included among the nine.

The second statute, the Federal Noxious Weed Act (FNWA), 7 U.S.C. §§ 2801–2814, was enacted in 1974. It allows the Secretary to order the destruction or disposal of "any product . . . moving into or through the United States . . . which he has reason to believe is infested by any noxious weed or contains any such weed. . . ." *Id.* at § 2805(a). Congress evidently viewed the FNWA as a necessary supplement to the FSA because the earlier statute was limited in its scope, regulating only shipments of agricultural and vegetable seeds. In a Senate report accompanying the proposed legislation, lawmakers observed that the FSA and similar state laws

> relate principally to the distribution of seed for planting purposes and do not reach other means by which injurious weeds can be disseminated into the United States. For example, seeds or screenings of seeds sold for animal feed, or crushing for oil or other manufacturing uses are not covered by these laws . . . [nor is] the introduction of noxious weeds by carriers such as farm machinery, sod, or fertilizer.

S.REP. No. 1313, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.CODE CONG. & ADMIN.NEWS 7660, 7663. Approximately 100 weeds have been designated as "noxious" under the FNWA. *See* 7 C.F.R. § 360.200. Unlike the FSA list, the FNWA list includes serrated tussock, the weed found in Pennington's shipments.

Although its language is otherwise broad, the FNWA contains a limitation that is central to this case. Section 12 of the Act, 7 U.S.C. § 2811, states that "[t]he provisions of

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

[the FNWA] shall not apply to shipments of seed subject to the Federal Seed Act" and "shall not amend or repeal any of the provisions of said Act...." It is this provision upon which Pennington relies in asserting that the Secretary lacked authority to order destruction of its seed shipments.

## II. Factual Background

Pennington is a supplier and processor of lawn grass seed. In late 1988, the company imported from Argentina two shipments of tall fescue seed, an agricultural seed whose importation unquestionably is regulated by the FSA. Each shipment was examined upon arrival by Plant Protection Quarantine (PPQ) officers from the Department of Agriculture's Animal and Plant Health Inspection Service (APHIS), and released for entry into the United States.

Unbeknownst to Pennington, the PPQ inspections revealed that the two shipments contained some serrated tussock seed. This discovery concerned officials because serrated tussock was designated as a noxious weed under the FNWA, reflecting a judgment that it posed a danger to the country's agriculture. Because Pennington's shipments fell under the FSA, however, it appeared that, under section 12 of the FNWA, no action based on that statute could be taken against them. Two days after the first shipment was approved for entry, on November 17, 1988, an internal PPQ memorandum noted this conclusion.

> Since the fescue seed is regulated by the Federal Seed Act (FSA), we apparently have no authority to take any action when it is found to be contaminated with a seed listed under the Federal Noxious Weed Act (FNWA). The FNWA does not apply to seed shipments that are regulated by the FSA.

See Affidavit of Mark D. Dopp (Dopp Affidavit), Att. B-2, App. at 166.

PPQ officials troubled by their inability to act against the shipments began a correspondence up the line of authority within the agency. On November 23, the PPQ regional director, B.W. Granberry, wrote to Richard Backus, PPQ Assistant Deputy Administrator, informing him that fescue seed containing serrated tussock had been released from its port of entry. Granberry noted the APHIS/PPQ manual provision clearly stating the agency's lack of authority "for taking action on seed that is regulated by the FSA ... when that seed is found contaminated with seed listed under the FNWA." See Dopp Affidavit, Att. B-3, App. at 168-69. He continued:

> [W]e were surprised to have the loophole in the law pointed out to us.... [W]e were stunned by this situation, since this allows the Noxious Weed to be planted into an agricultural production environment.
>
> ... [T]he inability to protect American Agriculture from Noxious Weeds in this instance is discouraging and demoralizing.
>
> Any action that you may take to close this loophole will be appreciated by all of us.

In response to Granberry, Backus confirmed that the FNWA prohibits action under that statute when weeds are found in shipments regulated by the FSA and observed that this fact "has been known to PPQ since the FNWA was enacted." See Dopp Affidavit, Att. B-4, App. at 173. On December 28, 1988, Backus issued a memorandum notifying state seed officials that serrated tussock had been found in shipments of fescue seed, and confirming that "[b]ecause the fescue is regulated by the FSA, Plant Protection and Quarantine can take no action." Dopp Affidavit, Att. B-5, App. at 175. He stated that the agency was exploring "the avenues of action open to us to close this 'loophole,' " and noted that "[t]he remedies may be legislative or regulatory changes."

Meanwhile, unaware of the serrated tussock or the Department of Agriculture's concerns about the weed, Pennington processed the fescue seed, blending it with other seed. The blended mixture was shipped about February 1, 1989 to more than 1,600 K-Mart stores throughout the United States for sale to consumers.

A few days later, on February 7, Backus sent a terse memorandum to state regulatory officials reversing PPQ's earlier position. In its entirety, the notice stated:

This supersedes our previous communication dated December 28, 1988, DA letter #88–43, regarding Federal Seed Act (FSA)/Federal Noxious Weed Act (FNWA) Interactions.

Any weed or imported weed seed listed in the FNWA regulations is subject to the FNWA even if it occurs in a shipment of agricultural or vegetable seed. Accordingly, we are taking action on the shipments reported in our previous message.

Dopp Affidavit, Att. B–6, App. at 177. Two weeks later, Pennington was notified about the presence of serrated tussock in the fescue seed shipments, and on March 3, 1989, PPQ ordered Pennington to undertake remedial measures.

Pennington began an immediate recall of all unsold bags containing the seed. The company was able to sell about 68,000 pounds of the recalled blend to a buyer in Greece at a reduced price, and destroyed the remaining 200,000 pounds. It claimed a total out-of-pocket loss of $222,146.64, and sought compensation from the government under section 6(d) of the FNWA.[1] The government refused to pay, and Pennington filed this suit.

Pennington raised four independent arguments before the district court. Only the first, based upon the plain language of the statute, is of significance here.[2] Pennington claimed that section 12 of the FNWA expressly rendered that statute inapplicable to its shipments of agricultural seed. Because serrated tussock was not a "noxious weed" under the FSA, Pennington contended that the destruction order was unauthorized and that it was entitled to compensation.

The Secretary argued that the FNWA gave regulatory officials broad authority to fill the gaps left by existing seed statutes, including the FSA. Because the presence of serrated tussock constituted an emergency threat to the welfare of American agriculture, the Secretary was authorized to issue an order under the FNWA requiring Pennington to dispose of the noxious weeds.

The district court accepted the Secretary's broad reading of the FNWA, and accordingly ascribed a narrow scope to section 12, the provision excluding from the FNWA's jurisdiction any shipment "subject to" the FSA:

All agricultural and vegetable seeds are "subject" to the FSA for labeling purposes. For purposes of controlling the spread of noxious weeds, however, the only agricultural and vegetable shipments "subject" to the FSA are shipments containing the nine noxious-weed seeds enumerated in the FSA. If agricultural or vegetable seeds contain noxious weeds which are not enumerated in the FSA noxious-weed seed list, the FSA is inapplicable to those shipments for purposes of noxious weed regulation.

*Pennington Enterprises, Inc., et al. v. United States of America, et al.*, Civ. No. 90–1067, Mem.Op. at 13 (D.D.C. March 31, 1992).

On appeal, Pennington again challenges this construction of the statutes. As the facts are undisputed, and the interpretation of the FNWA and FSA raises a pure question of law, our review is plenary. *Harbor Ins. Co. v. Omni Constr., Inc.*, 912 F.2d 1520, 1522 (D.C.Cir.1990).

## III. *Plain Meaning of the Statutes*

The government's position in this case depends heavily on pragmatism. If serrated tussock is classified as a dangerous enemy of American agriculture, as reflected by its inclusion on the FNWA noxious weed list, surely the law could not permit it to enter the country unregulated in shipments of agricultural or vegetable seed. Thus, despite section 12's language seeming to exclude shipments covered by the FSA from the FNWA's jurisdiction, the Secretary must have the authority to take emergency action against noxious weeds appearing on the FNWA list even when they are found in shipments otherwise governed by the FSA.

---

1. This provision, 7 U.S.C. § 2805(d), provides that an owner of seed whose property is ordered destroyed by the Secretary is entitled to "just compensation" if that destruction "was not authorized" under the FNWA.

2. Because we find that the court erred in construing the statute, we need not consider Pennington's three alternative theories.

The district court essentially adopted this perspective, concluding that, in the fight against noxious weeds, a shipment is "subject to" the FSA only insofar as it contains a weed on the FSA list. All other noxious weeds are controlled by the FNWA. Under this interpretation of the FNWA, no shipment containing a noxious weed on *either* statute's list could be cleared for entry into the United States.

This may be an expedient solution to the noxious weed "loophole," but it is contrary to explicit statutory language. Section 12 plainly excludes from FNWA coverage "shipments of seed subject to the Federal Seed Act." The provision contains no limitation whatsoever. All shipments of vegetable and agricultural seed are governed by, or "subject to," the FSA. Thus, section 12 sensibly can mean only that, once a shipment of vegetable or agricultural seed is found to be in compliance with FSA requirements, it is protected from a second-tier review to determine compliance with FNWA standards.

Through the simple exclusionary language of section 12, Congress unambiguously limited the FNWA's reach to those shipments outside the FSA's noxious-weed jurisdiction—to shipments, for example, containing seed to be used in animal feed or shipments of used farm machinery carrying clumps of plant material. Nothing in the FNWA suggests that the Secretary's authority may extend to agricultural and vegetable shipments if the FNWA list of noxious weeds is longer than the FSA's. Although the FNWA confers emergency authority upon the Secretary to prevent the dissemination of noxious weeds, *see* 7 U.S.C. § 2805(a), the emergency provision does not contain an exception to section 12's blanket limitation on the Secretary's authority. A shipment containing agricultural or vegetable seeds is subject *only* to the FSA's regulations, and the Secretary does not have emergency power under the FNWA to reconfigure the FSA list of noxious weeds.

3. One type of seed does appear on both lists, *Cuscuta* spp., dodder. *See* 7 U.S.C. § 1561(a)(9)(B) (FSA) and 7 C.F.R. § 360.200 (FNWA regulations).

Moreover, the gap in the FSA that the Secretary asserts a need to fill by means of the FNWA does not actually exist. The FSA explicitly gives the Secretary the authority to add to the list of nine noxious weeds that was a part of the original legislation. *See* 7 U.S.C. § 1561(a)(9). Presumably, any weed designated as noxious under the FNWA could be similarly designated under the FSA, after the appropriate notice and hearing procedures have been followed.[3] The fact that serrated tussock appears on the FNWA list, and not on the FSA's, thus results from the Secretary's failure to utilize fully the FSA rather than from a gap in the statutory scheme.

The probable explanation for the Secretary's inaction under the FSA was addressed at oral argument. The government's attorney pointed out that until Pennington's two shipments of fescue seed arrived in late 1988, USDA officials had never encountered an FSA shipment that was contaminated by a noxious weed that appeared exclusively on the FNWA list. This undoubtedly was so, the attorney explained, because the United States historically is an *exporter* rather than an importer of agricultural and vegetable seed. Pennington's importation of fescue seed in 1988 was unusual, made necessary because of drought conditions in this country.

It thus appears that the FSA list remained fixed at the original nine noxious weeds because there was no compelling reason to expand it. When Department of Agriculture officials unexpectedly were confronted with Pennington's shipments, which fell within the gap between the two statutes that their policy explicitly recognized, it was too late to use the FSA's specified procedures to withhold release of the contaminated seed. We cannot help but view the Secretary's policy reversal in this case as an effort to bypass those procedures, albeit for the well-intentioned purpose of protecting American agriculture from the immediate threat of a noxious weed.[4]

4. We do not understand why PPQ officials did not inform Pennington immediately about the serrated tussock and *request* that the company refrain from distributing the contaminated fescue seed. Even if the on-site inspectors felt they had

Although we need not consider legislative history when a statute's plain language is unequivocal,[5] that background reinforces the interpretation of the FNWA urged by Pennington and accepted by the government until it reversed its policy in this case. In considering the FNWA, Congress focused on the need to regulate noxious weeds entering the country *other* than in shipments of seed for planting. *See, e.g.,* S.REP. NO. 1313, 93d Cong., 2d Sess (1974), *reprinted in* 1974 U.S.CODE CONG. & ADMIN.NEWS 7660, 7663 (FSA and state seed laws "relate principally to the distribution of seed for planting purposes and do not reach other means by which injurious weeds can be disseminated into the United States"); *Federal Noxious Weed Act: Hearing on H.R. 7278 Before the Subcomm. on Conservation and Credit of the House Comm. on Agriculture,* 93d Cong., 1st Sess. 26 (1973) (testimony of APHIS Administrator Mulhern) ("[N]oxious weed seed[ ] that may be in crop seed ... is covered by the Federal Seed Act, and State Seed laws.") Congress clearly recognized that the law (*i.e.,* the FSA) already regulated noxious weeds when they appeared in certain kinds of shipments, and there is no indication that the new law was intended to make that existing one obsolete. To the contrary, section 12 is an explicit statement that the new legislation would not supersede the old, that each would have separate noxious-weed jurisdiction.

The subsequent legislative history relied upon by the district court is not inconsistent. In 1983, Congress amended the FSA to remove provisions regulating a category of "weed seeds" less troublesome than "noxious-weed seeds," and which were permissi-

ble if found in small amounts. The change reflected the Department of Agriculture's view that the "weed seed" provision served no purpose because the regulated species of weeds were prevalent throughout the country and routinely found in domestic crop seeds. H.R.REP. NO. 877, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.CODE CONG. & ADMIN.NEWS 3863, 3864.[6]

In its report on the proposed amendment, the House Committee on Agriculture noted that the amendments "would not in any way affect the Department's responsibility for examining imports for the presence of noxious weed seed under the Noxious Weed Act." *Id.* According to the district court, this language indicated that "Congress recognized that the FSA and FNWA could conceivably apply to the same shipments...." *See Pennington Enterprises,* Mem.Op. at 13. In our view, the district court overvalued the Committee's passing statement, which may have recognized only that the FSA amendments were not intended to affect the Department's separate authority under the FNWA. In any event, even if the comment reflects an assumption that the two statutes overlap in regulating noxious weeds, this is insufficient to assign a meaning to the FNWA that flies in the face of section 12's plain language. Otherwise, subsequent committee report language would rise to the level of a statutory amendment.

We therefore conclude that the Secretary acted beyond his authority in reversing Department policy on FSA shipments, and in ordering Pennington to destroy or dispose of its contaminated fescue seed.

---

no authority to make such a request, certainly PPQ Regional Director Granberry or Deputy Administrator Backus could have done so, and both were informed of the problem within two weeks after the first shipment was approved for entry on November 15. *See supra* at 8. The second shipment was not released until December 6.

Had the company known about the weed seed, it might have rejected the shipments from its Argentine supplier or delayed processing the imported seed. *See* Affidavit of Brooks Pennington, III at ¶ 11, Appendix at 182. It seems quite possible that the company's loss, and this case, could have been avoided.

**5.** When statutory language is unambiguous, "judicial inquiry is complete except in rare and

exceptional circumstances," *Demarest v. Manspeaker,* 498 U.S. 184, 190, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991).

**6.** Interestingly, the plant family within which serrated tussock is found—*Gramineae*—was regulated as a "weed seed" until the 1983 FSA amendments. *See* 7 C.F.R. § 201.107 (1993) (designating *Gramineae* family as weed seed); Declaration of Dr. James L. Reveal ¶ 6, App. at 221 (identifying serrated tussock as member of *Gramineae* family). The government at oral argument suggested that all members of the *Gramineae* family may not necessarily fit the characteristics of a common "weed seed."

## IV. *Conclusion*

The Secretary's authority under the FNWA does not permit him to take action against allegedly noxious weeds contained in shipments of agricultural or vegetable seeds, inasmuch as those shipments are regulated by the FSA and the FNWA explicitly excludes from its coverage "shipments of seed subject to the Federal Seed Act." The division Congress has chosen between the two Acts is that each shall govern different types of shipments. The Secretary has full authority to name the same weeds as noxious under both Acts, and thereby is able to protect American agriculture from the threat of noxious weed contamination.

Because the government acted contrary to its authority in attempting to apply the FNWA to the shipments of agricultural seed at issue here, the district court's summary judgment must be reversed and the case remanded to the district court for further proceedings on Pennington's claim for compensation.

*Reversed and remanded.*