IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-50493
_____

LLOYD BROWN,

                              Plaintiff - Appellee-Cross-Appellant,

                    versus

KINNEY SHOE CORP., doing
business as Foot Locker,
doing business as ASF/
Foot Locker, doing business
as Champs Sports, doing
business as Lady Foot Locker,
doing business as Susie's,
doing business as Athletic X-Press,

                              Defendant - Appellant-Cross-Appellee.
_____

        Appeals from the United States District Court for the
                    Western District of Texas
_____

                    January 15, 2001

Before JOLLY, SMITH, and BARKSDALE, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

        This appeal presents a challenge to various aspects of a jury

trial that resulted in a finding of intentional racial

discrimination in violation of Title VII. The plaintiff, Lloyd

Brown, brought this Title VII action against his former employer,

Kinney Shoes, d/b/a Foot Locker, ("Foot Locker"). He alleged racial

discrimination based on Foot Locker's failure to promote him to a

managerial position in a "non-ethnic store." Ultimately, the jury

found Foot Locker liable and awarded Brown $69,493 in past and future wages, $21,500 in mental anguish damages, and $250,000 in punitive damages, plus costs and attorney's fees.  The district court entered a judgment in favor of Brown, but reduced his damages by $1160 to meet the statutory cap.  On appeal, Foot Locker seeks review of (1) the district court's failure to conduct a <u>Batson</u> inquiry, (2) a number of evidentiary rulings, and (3) the sufficiency of the evidence to support the jury's verdict.  Brown seeks review of the district court's rulings on damages, attorney's fees, and a jury instruction on spoliation.[1]  We reject Foot Locker's <u>Batson</u> and evidentiary claims.  We also conclude that the evidence is sufficient to support Brown's failure to promote claim.  The evidence is not sufficient, however, to support his claim for constructive discharge.  While upholding liability for the failure to promote claim, we remand for a new trial on damages, including compensatory, emotional, and punitive damages.

---

[1]Brown introduced evidence that Foot Locker destroyed documents on the ethnic classification of its stores.

I

A

Lloyd Brown, who is black, worked for Foot Locker from February 1989 to December 1995. He began his management career with Foot Locker in October 1990 in the Killeen Mall store. Soon after assuming a management position, Brown perceived and was told by other black managers that black managers were not hired to manage "non-ethnic stores," and, further, that the managers of "non-ethnic stores" were more often promoted to district manager positions.[2] Additionally, Brown testified that he began to notice that the black managers were subject to harsher reviews and audits than were white managers.

In 1993, following Brown's request to be transferred to a "non-ethnic store," he was promoted to manager of the Town Center Mall store in Fort Worth, Texas. The Town Center Mall store, however, like the Killeen Mall store, was an "ethnic store." The sales volume of the Town Center Mall store was $1.1 million for the year before Brown's arrival. Although conditions at the Town Center Mall store were, concededly, anything but ideal (because of problems with crime, the imposition of a curfew, and store vacancies), the evidence at trial established that Brown had a

_____

[2]A considerable amount of time at trial was spent on the issue of how Foot Locker classified its Texas stores.

3

difficult time managing the store.  Sales dropped from $1.1 million to $980,000 in 1993.  By 1995, sales had dropped to $577,000 under Brown's management.  In 1996, however, Brown was able to increase sales to approximately $609,000.  In addition to declining sales, Brown also received critical evaluations from Jan Balder, his district supervisor, and from store auditors.  The critical evaluations stemmed from Brown's  problem with "shrinkage," that is, store inventory unaccounted for.

In early 1995, Brown moved his family from Fort Worth to Austin, Texas, so that they would be closer to his wife's mother. Sometime after moving his family to Austin, Brown applied for a transfer to one of Foot Locker's two new stores under construction in Austin.  Both of these stores were categorized as non-ethnic stores.

The first store, the Lakeline Mall store, was projected as a $900,000 volume store.  At trial, there was conflicting testimony regarding why Brown was not offered a managerial position at the Lakeline Mall Store.  District Manager Balder testified that Brown was denied a transfer to this store because it would have constituted a promotion, when he was not promotable given the drop in sales to just over $600,000 at the Town Center Mall store. Instead, Foot Locker promoted Mike Zoiber, a white male, who, Foot Locker argued at trial, was more qualified based on his work

4

evaluations. Brown offered testimony, which the jury apparently believed, demonstrating that Zoiber was less qualified based on the fact that he had only one year's experience as a manager at a "rookie" store, a store smaller than Brown's Town Center Mall store. Additionally, in response to Foot Locker's assertion that he was not promotable, Brown testified that after he was denied the Lakeline Mall job he was offered a managerial position at a Fort Worth Outlet Mall store, a store with a sales volume of $1.4 million to $1.6 million. The Fort Worth Outlet Mall store had an "ethnic store" classification. To support this testimony, Brown offered the testimony of the manager of the Outlet Mall store, Joe Maldonado, who stated that when Balder offered him the job she indicated that he (Maldonado) was the second choice for the job in that Brown had already declined the offer. Balder denies having offered a managerial position at the Outlet Mall to Brown. The jury, however, was entitled to reject her testimony, and apparently did.

The second store, the Barton Creek Square Mall store, was a $400,000 to $500,000 volume store. Foot Locker offered evidence establishing that Brown was denied a transfer to this store because it was classified as a "rookie" store for entry level managers only. Ultimately, Martin Rhoads, a Hispanic male manager with no

5

previous management experience, was hired by Foot Locker to manage the store.

By November 1995, Brown had become frustrated by his inability to secure a promotion or even a transfer to a "non-ethnic store." Consequently, he filed a race discrimination charge with the EEOC. While the charge was pending, in early 1996, a new district manager was assigned to Brown's region, and Brown again expressed to his new manager his desire to be transferred/promoted to a "non-ethnic store." The manager told Brown that he would have to prove himself. Because of this conversation, and Foot Locker's continual refusal to transfer/promote him, Brown resigned from Foot Locker.

B

On November 26, 1997, Brown filed this Title VII action against Foot Locker alleging intentional race discrimination.[3] Following a somewhat lengthy trial, the jury returned a verdict for Brown finding intentional race discrimination and awarding him

---

[3]In his original complaint, Brown alleged claims pursuant to 42 U.S.C. § 1981 and the Texas Labor Code. However, at the charge conference, the district court referred to Brown's claims as only brought pursuant to Title VII. Brown made no attempt to correct the district court during the charge conference. Additionally, Brown did not object to the district court's instructions to the jury limited to Title VII.

$340,000 in damages.[4]  Additionally, the court awarded Brown costs and attorney's fees in the amount of $148,339.44.

Foot Locker moved to set aside the verdict under Federal Rule of Civil Procedure 50, and the court denied its request.  Foot Locker then filed this appeal.  Foot Locker seeks review of: (1) the district court's failure to conduct a Batson inquiry following its timely objection to Brown's use of all of his peremptory strikes on white jurors;  (2) the grant of one of Brown's Batson challenges; (3)  the denial of Foot Locker's motion for judgment on the issue of intentional discrimination; (4) the denial of Foot Locker's motion for judgment on the issue of constructive discharge; (5) a series of evidentiary rulings centering on the refusal of the court to allow Foot Locker to offer testimony regarding its use of merchandising codes, and the reasons why Brown was not promoted;  (6) the entry of judgment for punitive damages in the absence of any evidence of malice or reckless disregard; and (7) the entry of judgment for damages for emotional distress in the absence of any evidence of particular injuries suffered by Brown.

---

[4]Specifically, the jury awarded Brown $39,833 for loss of wages and benefits from the date of the defendant's discriminatory conduct until the present; $29,660 for loss of value of earning capacity from this date into the future caused by the defendant's discriminatory conduct; $21,500 for emotional pain, suffering, mental anguish and the loss of enjoyment of life; and $250,000 in punitive damages.

7

Brown cross-appeals. He seeks review of the district court's reduction of punitive damages and denial of supplemental attorney's fees. If the case is reversed or remanded, Brown also seeks review of the district court's denial of his requested jury instruction on spoliation.

## II

Foot Locker challenges both the district court's refusal to conduct a full Batson inquiry in response to its challenge of Brown's peremptory strikes, and the court's decision to sustain Brown's Batson challenge to Foot Locker's peremptory strike of a black juror.

## A

We first address Foot Locker's claim that the district court failed to fulfill its duty to conduct a Batson inquiry. The law is now well settled: "A party to a civil suit can challenge another party's use of a peremptory strike that excludes a prospective juror on the basis of that juror's race." Greater Plains Equipment, Inc. v. Koch Gathering Systems, Inc., 45 F.3d 962, 964 (5th Cir. 1995)(citing Edmonson v. Leesville Concrete Co., 500 U.S. 614 (1991); Batson v. Kentucky, 476 U.S. 79 (1986)). In Batson, the Supreme Court held that equal protection principles prohibit a prospective juror from being peremptorily challenged on the basis of his or her race. See Batson, 476 U.S.

at 86-87 (stating that by denying a person participation in jury service on account of race, the offending party "unconstitutionally discriminated against the excluded juror"). The Batson Court reasoned that while it is clear that "[a]n individual juror does not have a right to sit on any particular petit jury,. . . he or she does possess the right not to be excluded from one on account of race." United States v. Huey, 76 F.3d 638, 640 (5th Cir. 1996)(citing Batson, 476 U.S. at 87).

We have developed a three-step process for evaluating Batson challenges:

> First, the complaining party must make a prima facie showing that opposing counsel has exercised a peremptory challenge on the basis of race. Once this showing has been made, the burden shifts to the striking party to articulate a race-neutral explanation for the strike. Thereafter, the court must determine whether the Batson claimant has proven purposeful discrimination.

Great Plains Equipment, 45 F.3d at 964-65 (citing United States v. Bentley-Smith, 2 F.3d 1368, 1373 (5th Cir. 1993)). Once a court has called on counsel to provide race-neutral justifications for the use of peremptory strikes, we review only the district court's finding of discrimination, not whether the party has made a prima facie case. United States v. Forbes, 816 F.2d 1006, 1010 (5th Cir. 1987). If the trial court determines that a party failed to make a prima facie showing, however, opposing counsel is not

9

required to come forward with a neutral explanation for the challenges.  Soria v. Johnson, 207 F.3d 232, 239 (5th Cir. 2000).

To establish a prima facie case, a party is required to show that the circumstances surrounding the peremptory challenges raise an inference of purposeful discrimination.  Batson, 476 U.S. at 96; Soria, 207 F.3d at 237. The trial court should consider all relevant circumstances in determining whether a prima facie Batson violation can be established.  McGinnis v. Johnson, 181 F.3d 686, 691 (5th Cir. 1999).  Factors that give rise to an inference of discrimination include, among others, a pattern of strikes against jurors of a certain race and the party's statements and questions during voir dire.  United States v. Branch, 989 F.2d 752, 755 (5th Cir. 1993). "A prima facie case of racial discrimination requires a defendant to 'come forward with facts, not just numbers alone.'" Id. (quoting United States v. Moore, 895 F.2d 484, 485 (8th Cir. 1990)).  In this circuit, a trial court's determination that a party has failed to make a prima facie showing is accorded a "presumption of correctness, which can only be rebutted by 'clear and convincing evidence.'"  Soria, 207 F.3d at 238.  See also Branch, 989 F.2d at 755 ("a finding that appellants did not make a prima facie case of discrimination under Batson . . . is reviewed for clear error").

A party that does not raise facts or make timely <u>Batson</u> claims in the district court waives the right to raise them on appeal. See <u>Branch</u>, 989 F.2d at 755 n.2 ("On appeal, appellants have noted facts in alleged support of their <u>Batson</u> claim. We may not consider them. . . . [T]he failure to enunciate these facts in the district court amount[s] to a waiver"). Thus, it is important that the district court afford the parties ample opportunity to create a <u>Batson</u> record. As the Eighth Circuit has noted,

> a defendant who requests a prima facie finding of purposeful discrimination is obligated to develop a record, beyond numbers, in support of the asserted violation. And the district court . . . must give the defendant a reasonable opportunity to do so. Such a record will allow the appellate court to review the findings at issue.

<u>United States v. Dawn</u>, 897 F.2d 1444, 1448-49 (8th Cir. 1990).

B

On appeal, Foot Locker argues that the district court committed reversible error by completely disregarding the three-step procedure for evaluating <u>Batson</u> claims and by summarily denying its challenge. Specifically, Foot Locker argues that it raised a timely objection, that it made a prima facie case of discrimination, and that the judge erred by failing to require Brown to give race-neutral reasons for his peremptory strikes.

11

Brown responds by arguing that Foot Locker failed to carry its burden under the first prong of the <u>Batson</u> test, that is, Foot Locker failed to make a prima facie showing that the challenges were exercised on the basis of race. Brown argues that by failing to require race-neutral explanations, the court made a determination that Foot Locker did not make a prima facie case of discrimination.

In truth, the trial court made no explicit findings at all. It summarily dismissed Foot Locker's <u>Batson</u> claim without allowing Foot Locker to attempt to make a prima facie case. In response to Foot Locker's <u>Batson</u> challenge for Brown's use of peremptory challenges against four white jurors, the court's only response was, "Well, that objection is overruled." Because the district court made no explicit findings and did not allow Foot Locker to state the reasons for its objection, there is no record on which to rely to determine whether Foot Locker made a prima facie case.

On appeal, Foot Locker only argues that it established a prima facie case. It does not argue either that the district court did not afford it an opportunity to make a prima facie case[5] or that

---

[5]By not giving Foot Locker a full opportunity to make a <u>Batson</u> record to establish its prima facie case, and by not making any findings of its own, the district court did not discharge its duty under <u>Batson</u>. As the Ninth Circuit found in a similar case,
the district court[] clear[ly] disregard[ed] . . . even the most basic of <u>Batson</u> safeguards in summarily overruling, with absolutely no inquiry or discussion [the

12

the district court  made no finding on the issue.  As such, we must review whether Foot Locker made a prima facie case when it presented its claim to the district court.  The district court's determination is entitled to a presumption of correctness.

At the time of the <u>Batson</u> objection, Foot Locker objected only on the basis that Brown used his four peremptories on white jurors. Standing alone, these numbers do not make a prima facie case.  Foot Locker did not present other facts that could have led the court to find an inference of discrimination. Although the facts in this case--a white supervisor accused of discrimination against a black salesman on the basis of race, the fact that race was an issue during voir dire, and the fact that the plaintiff used all four of its strikes on white jurors (the jury pool consisted of 12 whites, 3 blacks, and 1 Hispanic)--suggest that Foot Locker might have made a more convincing showing for a prima facie case, it did not present and argue these facts in support of its claim. Instead, Foot Locker raised only the race of the struck jurors.  On this basis, we cannot say that the district court was clearly erroneous in rejecting the <u>Batson</u> challenge.  Although the record before us

---

plaintiff's] <u>Batson</u> objection . . . In so doing, the district court precluded [the plaintiff] from stating, let alone proving, what appears evident from the defendants' use of . . . their  . . . peremptory challenges . . .
<u>Montiel v. City of Los Angeles</u>, 2 F.3d 335, 340 (9th Cir. 1993).

13

contains no articulated findings by the district court and no argument by counsel on the issue, we can only conclude that the district court considered that 75 percent of the jury pool was white and found no inference of discrimination from the scant facts to which counsel alluded--strikes against four white jurors. Therefore, the district court's finding that Foot Locker failed to make a prima facie case of discrimination was not clearly erroneous.

C

Foot Locker also appeals the trial court's decision to sustain Brown's Batson challenge to Foot Locker's peremptory strike of one of three black jurors on the panel. During jury selection, Foot Locker first attempted to strike two of the black jurors for cause, stating that one of the jurors, juror Sims, believed that he had been the defendant in a frivolous lawsuit, and that the other juror had worked for the first juror, who might unduly influence her. After the court refused the cause challenge, Foot Locker used two of its four peremptories to strike juror Sims and the other black juror on the sixteen person venire, juror Brown, who had not been challenged for cause. After Brown challenged the strike on Batson grounds, the court asked Foot Locker to state its reasons for striking the jurors. Foot Locker articulated a reason for striking juror Sims--he had been involved in a lawsuit and would be hostile

14

to litigants--but the district court found it pretextual, and sustained the <u>Batson</u> challenge. Finding that Foot Locker's neutral reasons were adequate with respect to juror Brown, however, the court allowed the juror to be struck.

Although explanations are generally considered to be race-neutral unless the discriminatory intent is inherent in the explanation, this determination depends in significant part on an evaluation of the credibility and demeanor of the attorney exercising the challenge. Thus, the district court's determination that a party used peremptory strikes in a discriminatory manner is entitled to deference, and should not be overturned absent clear error. <u>United States v. Kelley</u>, 140 F.3d 596, 606 (5th Cir. 1998).

On the record before us, we cannot say that the district court was clearly erroneous in concluding that Foot Locker's explanation for challenging juror Sims was pretextual. Foot Locker challenged all three black venire members, either by peremptory strike or for cause. Although Foot Locker claimed that it used its peremptory to strike juror Sims because it was worried that his prior experiences with litigation would influence him, it did not challenge two white jurors who had also been parties to litigation. Given these facts, we will not disturb the district court's finding that Foot Locker evinced purposeful discrimination in striking juror Sims. We now turn to the merits of the appeal.

As an initial matter, we must examine the essence of Brown's claims. Brown claims that Foot Locker intentionally discriminated against him based on his race during the course of his employment. The facts, as presented by Brown, encompass both a failure to promote (or transfer) claim, and a constructive discharge claim. These two claims, however, were not clearly separated at trial. The same evidence was presented to support both claims. The jury instructions on the issue of intentional discrimination did not discuss the elements of constructive discharge;[6] to be sure,

---

[6]The district court's jury instruction read as follows: It is unlawful for an employer to discharge or otherwise discriminate against an employee because of the employee's race. In order for Mr. Brown to prevail on his claim against Foot Locker, he must prove by a preponderance of the evidence that his race was a motivating factor in any of Foot Locker's adverse employment decisions. An adverse employment decision is any decision by an employer such as Foot Locker that negatively affects an employee such as Mr. Brown with respect to compensation, tenure, conditions or privileges of employment. Taking adverse employment action toward an employee who is black is not illegal if the reasons for doing so are unrelated to the employee's race. Therefore, the fact that Mr. Brown is black and Foot Locker took adverse employment actions towards him is not sufficient, in and of itself, to establish his claim under the law. Similarly, the fact that Foot Locker may have mistreated the Plaintiff or made an unwise decision regarding the Plaintiff's employment is not sufficient to establish the Plaintiff's claim under the law. Finally, simply because you do not agree with the employment decisions made by Foot Locker or the manner in which the decisions were made is not sufficient to establish Plaintiff's claims under the law. You must find that an

constructive discharge was not addressed until the instruction on the award of damages. The verdict form did not distinguish the two issues for the jury; it asked "[d]o you find from a preponderance of the evidence that Defendant Foot Locker discriminated against Mr. Brown based on his race?" Despite this consolidation of failure to promote and constructive discharge at trial, we must separate these two jury issues to determine whether there is sufficient evidence to support the jury award.

Foot Locker contends that the district court erred in denying its motion for judgment on the issues of, first, intentional discrimination, which we interpret as failure to promote, and second, constructive discharge. Foot Locker argues that Brown provided no evidence to show that Foot Locker's reasons for failing to promote Brown were pretextual, or to show that Foot Locker made a calculated effort to pressure him into resignation.

We review the denial of a party's motion for judgment as a matter of law de novo, applying the same standard that the district court used. Rutherford v. Harris County, Texas, 197 F.3d 173, 178 (5th Cir. 1999). "The district court properly grants a Rule 50 motion for judgment as a matter of law only where the facts and inferences indicate a particular outcome so strenuously that

adverse employment decision was made by Foot Locker because of Mr. Brown's race in order to answer "yes" to Question One.

reasonable minds could not disagree." Aquillard v. McGowen, 207
F.3d 226, 228-29 (5th Cir. 2000). In deciding a Rule 50 motion,
the court should consider all the evidence in the light most
favorable to the non-moving party. Id. at 228. "A jury verdict
must be upheld unless 'there is no legally sufficient evidentiary
basis for a reasonable jury to find' as it did." Vadie v.
Mississippi State Univ., 218 F.3d 365, 372 (5th Cir. 2000) (quoting
Fed. R. Civ. P. 50(a)(1)). Even if this court would reach a
different conclusion as trier of fact, "we are not free to reweigh
the evidence or to re-evaluate credibility of witnesses." Hiltgen
v. Sumrall, 47 F.3d 695, 699 (5th Cir. 1995).

## A

We start with the basics. To succeed on his Title VII
intentional discrimination claim, Brown must prove by a
preponderance of the evidence that he was denied employment
opportunities because of his race. "An employer is entitled to
judgment as a matter of law on this ultimate question 'if the
evidence taken as a whole would not allow a jury to infer that the
actual reason for the [employer's decision] was discriminatory.'"
Vadie, 218 F.3d at 372 (quoting Rhodes v. Guiberson Oil Tools, 75
F.3d 989, 994 (5th Cir. 1996) (en banc)). After a case has been
fully tried on the merits, as has this one, the inquiry shifts from
a focus on whether the plaintiff has made a prima facie case of

18

race discrimination to the question of whether the record contains sufficient evidence to support the jury's finding of race discrimination. Harrington v. Harris, 118 F.3d 359, 367 (5th Cir. 1997). Thus, the question is whether the evidence was sufficient for the jury to find that Brown was not promoted because of his race.

Foot Locker contends that the evidence indisputably showed that Brown had not performed well enough to qualify for a promotion to a higher volume store, that he was less qualified than the individual who did get the promotion, and that he would not have been well placed in a lower volume store. Furthermore, Foot Locker argues that the cases indicate that courts should be deferential to the judgment of employers in making promotion decisions in their businesses. See Odom v. Frank, 3 F.3d 839, 847 (5th Cir. 1993) (noting that judges should be reluctant to substitute their own views unless disparities are "so apparent as virtually to jump off the page and slap us in the face"). Brown counters Foot Locker's claim with evidence of strong evaluations, and more years of management experience than the individual who was selected. Brown also testified that, although not spoken at the time, he would have been willing to accept a pay cut to manage the smaller non-ethnic store.

Brown also introduced evidence attempting to show that Foot Locker's method of promoting managers systematically treated black candidates differently. The evidence showed that, for merchandising purposes, Foot Locker classified its stores based on the racial makeup of each store's customer base. The evidence also showed that, generally, black managers were not promoted to management positions in non-ethnic stores.[7] There was testimony, conclusionary in nature, that also suggested that white managers were promoted more frequently and that black managers were evaluated more harshly.

Brown also introduced evidence to show that Foot Locker's reasons for failing to promote Brown out of the ethnic store--that the alternative stores were either too big or too small for his experience level--were pretextual. Brown testified that Foot Locker offered to promote him to a 1.4 to 1.6 million dollar ethnic store, but refused to promote him to either a 900,000 dollar or a 300,000 to 500,000 dollar non-ethnic store. Another Brown witness corroborated this testimony. Foot Locker presented evidence that it never offered him management of the 1.4 million dollar store, directly contradicting Brown's testimony.

---

[7]The evidence on promotion to non-ethnic stores was primarily anecdotal, because most of Foot Locker's documentation on the ethnic classification of stores was destroyed, allegedly pursuant to Foot Locker's document retention policies.

Although much of the evidence is conflicting, it is legally sufficient for a jury to find intentional discrimination. The jury, exercising its function of determining facts and weighing credibility, was free to believe Brown's testimony and evidence over the evidence offered by Foot Locker. Brown introduced evidence that white managers with similar evaluations were promoted to non-ethnic stores, and evidence suggesting that black managers were generally not chosen to manage non-ethnic stores. Brown testified that despite requesting positions at non-ethnic stores on multiple occasions, he was denied the opportunity to manage a non-ethnic store, although he was apparently promotable to ethnic stores. Based on that, and similar evidence, the jury could have concluded that Foot Locker's claim that Brown was not qualified for the higher volume store was pretextual, and that Foot Locker intentionally discriminated against Brown by not promoting him to a non-ethnic store.

B

Foot Locker also appeals the district court's denial of Foot Locker's motion for judgment on constructive discharge. As we pointed out earlier, Brown was not discharged. He resigned. A resignation is actionable under Title VII, allowing the plaintiff to seek compensatory damages for events after the resignation, only if the resignation qualifies as a constructive discharge. To prove

21

a constructive discharge, a "plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign." Faruki v. Parsons, 123 F.3d 315, 319 (5th Cir. 1997). In determining whether a reasonable employee would feel compelled to resign, we have considered the relevancy of the following events:

> (1) demotion; (2)reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status] . . .

Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000) (alteration in original) (quoting Barrow v. New Orleans Steamship Ass'n, 10 F.3d 292, 297 (5th Cir. 1994)). Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim. Benningfield v. City of Houston, 157 F.3d 369, 378 (5th Cir. 1998). Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge, as is a discriminatory failure to promote. Boze v. Branstetter, 912 F.2d 801, 805 (5th Cir. 1990); Landgraf v. USI Film Productions, 968 F.2d 427, 429-30 (5th Cir. 1992), aff'd, 511 U.S. 244 (1994).

Brown contends that he resigned because he was repeatedly denied promotions and transfer opportunities. He also contends that his 1993 transfer to the Fort Worth Town Center Mall was

22

actually a demotion--not the promotion he was promised--because the store was continually losing money. Because the Fort Worth Town Center Mall store lost revenue while he was manager, Brown further testified that he lost ten to fifteen thousand dollars in salary and bonuses.

These facts, without more, are insufficient for a finding that a reasonable employee in Brown's position would have felt compelled to resign, particularly in light of the fact that he was pursuing an EEOC remedy that could have addressed any discrimination he suffered in failing to be promoted or transferred. Although, in hindsight, it is clear that Brown's transfer to the Fort Worth Town Center Mall did not result in the benefits of a promotion, Brown did not lose responsibilities by moving to that store. He was indeed the manager of a larger store initially, which deteriorated only under his management (for which, it is true, he may not have been wholly blameworthy). His work was not degrading or menial, and he was not subjected to badgering or harassment designed to encourage his resignation. In fact, Brown himself testified that he was offered a promotion to a 1.4 million dollar store shortly before he resigned. In essence, Brown's resignation, as a matter of law, was not justified by working conditions that had become so intolerable that no reasonable person could have worked there under those conditions. We therefore reverse the district court's denial

23

of Foot Locker's motion for judgment as a matter of law on the issue of constructive discharge and any damages resulting therefrom.

This reversal, however, does not affect our holding affirming liability on Brown's failure to promote claim. Although the jury verdict form did not separate Brown's failure to promote and constructive discharge claims--instead, simply finding Foot Locker liable for racial discrimination--the constructive discharge aspect of the claim is supported only by the evidence concerning Brown's failure to be transferred or promoted. Brown claimed that he was constructively discharged <u>because</u> he was denied transfers and promotions to non-ethnic stores. Thus, in finding that Foot Locker intentionally discriminated against Brown, the jury necessarily found that Brown was denied transfers and promotions, or other advancement opportunities, based on his race. As we have earlier noted, the evidence supports such a finding. The jury verdict is therefore sufficient to uphold Foot Locker's liability on Brown's failure to promote claim. The compensatory damage award, however, obviously included damages relating to both the constructive discharge claim and the failure to promote claim. No compensatory damages that may be based on the claim of constructive discharge can stand. Thus, the case must be remanded for a new trial on compensatory damages.

IV

Furthermore, Foot Locker specifically appeals the award of both punitive damages and damages for emotional distress. In this appeal, however, we will not address these specific damage awards. Because we have overturned the finding of constructive discharge, all damages, including punitive and emotional, must be supported by the failure to promote or transfer claim alone. A new determination of the compensatory injuries that flow from the claim may fundamentally affect a jury's determination of emotional and punitive damages. See Hardin v. Caterpillar, 227 F.3d 268, 272-73 (5th Cir. 2000) (noting the "practical inseparability of the issues of intent, of damages for emotional injury, and of punitive damages" and that legal systems reflect the "linkage of actual and punitive damages in locating caps for punitive awards"). Thus, all damages must be reconsidered. We therefore remand for a retrial on the issue of compensatory, punitive and emotional damages that flow from the failure to promote.

V

Finally, we find no reversible error in the evidentiary issues contested by Foot Locker. We have affirmed the district court's judgment on liability for intentional discrimination based on failure to promote, thus, there is also no need to address Brown's proposed jury instruction on spoliation. We will not address

25

Brown's request for additional attorney's fees, the final issue presented in this appeal. The appropriateness of additional attorney's fees will be more properly addressed at the conclusion of this remand.

VI

Because we find that the district court properly denied Foot Locker's motion for judgment as a matter of law on the issue of failure to promote, but should have granted Foot Locker's motion for judgment as a matter of law on the issue of constructive discharge, we AFFIRM in part, REVERSE in part, and REMAND for a retrial on the issue of damages.

AFFIRMED in part; REVERSED in part; and REMANDED.