IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-10875
_____


DENISE DOHERTY,

Plaintiff-Appellant,

versus

CENTER FOR ASSISTED REPRODUCTION,

Defendant-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Texas, Fort Worth Division
_____

June 18, 2001

Before FARRIS,[*] JOLLY, and DAVIS, Circuit Judges.

PER CURIAM:[**]

Appellant Denise Doherty appeals the district court's grant of summary judgment for Appellee Center For Assisted Reproduction ("the Center") on her claim of discriminatory discharge under Title VII, 42 U.S.C. § 2000e. Because the record reflects that Doherty failed to present evidence sufficient to support a claim of

_____

[*]Circuit Judge of the Ninth Circuit, sitting by designation.

[**]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

discriminatory constructive discharge, we AFFIRM.

Doherty was employed as an embryologist at the Center, an infertility clinic owned and operated by Drs. Kevin and Kathy Doody. Doherty, who supervised the in-vitro fertilization and andrology labs, was responsible for monitoring lab activities, scheduling hours for numerous lab employees, overseeing training, and assisting the Doodys in making hiring and salary decisions.

In March 1997, Doherty informed the Center that she was pregnant. While the Center had no official paid maternity leave policy, the Center authorized Doherty to take paid maternity leave from August 1997 to November 1997. When Doherty returned to work in December 1997, the Center informed her that she would not receive a Christmas bonus because she had received an equivalent amount in paid maternity leave. At the same time, the Center told Doherty that she would no longer have knowledge of, or provide input as to, the raises or bonuses given lab employees. According to Doherty, the Center also began auditing her time cards.

During this period Doherty contacted a former supervisor at the Center, now working at Presbyterian Hospital, to inquire about possible embryologist openings at Presbyterian. Doherty was informed in January 1998 that there was an opening, but she did not apply for the position at that time.

In February 1998, Doherty and other Center managers were asked to sign a confidentiality agreement. Doherty alleges that she was

2

asked by Dr. Doody at that time to work part-time with a pay reduction, and was encouraged to spend more time with her child. Doherty claims that Dr. Doody became angry when she refused to work part-time.

On March 2, 1998, Martin Langley, a co-employee of Doherty's, informed the Center that he was leaving to join the in-vitro fertilization lab at Presbyterian. The Center, believing that Langley's departure would have a negative impact on its operations, negotiated with Langley and offered him a co-supervisor position in the in-vitro lab with Doherty. On March 12, the Center officially announced its restructuring move, under which Langley would take over responsibility for the lab's day-to-day operations while Doherty retained some responsibilities over the in-vitro lab and all responsibilities over the andrology lab.

Doherty immediately contacted Presbyterian and expressed interest in the job opening with Presbyterian. She received and accepted an offer from Presbyterian within a week of the Center's restructuring move. On March 24, 1998, Doherty voluntarily resigned from her position at the Center. She filed suit in December 1998 against the Center, alleging that she was discriminated against on the basis of sex and pregnancy under Title VII and was not paid overtime wages in violation of the FLSA. The district court granted summary judgment for the Center on both claims, and Doherty appealed only the denial of her discharge claim

3

under Title VII.  The record reflects that, as a matter of law, the evidence presented by Doherty fails to support a claim of discharge in violation of Title VII.  We therefore affirm the judgment of the district court.

To establish a termination prohibited by Title VII, a plaintiff must first make a prima facie case by showing that she: 1) is a member of a protected class; 2) was discharged; 3) was qualified for the position from which she was discharged; and 4) was replaced by a member of an unprotected class.  Faruki v. Parsons S.I.P., Inc., 123 F.3d 315, 318 (5th Cir. 1997).  Once established, the prima facie case creates a presumption of discrimination, which the defendant can rebut by articulating a legitimate, non-discriminatory reason for its action.  Once the defendant proffers such a reason, the plaintiff must prove that it is not the true reason for the employment decision and that unlawful discrimination was a pretext for the defendant's action. Id. at 319.

When an employee resigns, she may satisfy the discharge requirement of prong two by establishing constructive discharge. To prove constructive discharge, a plaintiff must show that "working conditions were so intolerable that a reasonable employee would feel compelled to resign." See id. The factors we consider in analyzing a claim of constructive discharge include: 1) demotion;  2) reduction  in  salary;  3) reduction  in  job

4

responsibilities; 4) reassignment to menial or degrading work; 5) reassignment to work under a younger supervisor; 6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or 7) offers of early retirement or continued employment on terms less favorable than the employee's former status.  See Brown v. Kinney Shoe Corp., 237 F.3d 556, 565 (5th Cir. 2001).

The district court found that Doherty failed to make a prima facie case of discriminatory discharge because she did not establish that she was "discharged" by the Center.  Specifically, the court noted that Doherty failed to establish that she was demoted or constructively discharged when she voluntarily sought out and accepted employment with Presbyterian.  Doherty argues on appeal that the evidence established that she was constructively discharged from her position by the Center's reorganization of the in-vitro lab and the alleged harassment she endured following her return to work from maternity leave.

The record reflects that, as a matter of law, Doherty failed to establish that neither the new conditions of her job nor the negative attitudes toward her by management created a situation so intolerable that a reasonable person would be compelled to resign. The evidence shows that Doherty did not receive a reduction in salary as a result of the reorganization.  While the Center does not deny that Doherty's job responsibilities were reduced, there is

5

no evidence that she was reassigned to menial or degrading work--only that some of her prior responsibilities were given to Langley. Furthermore, as co-supervisors of the in-vitro lab, Doherty and Langley were asked by the Center to "cooperate" with one another in running the lab operations. The fact that Langley had less experience than Doherty does not support constructive discharge; Doherty was not assigned to work under Langley--she was assigned to work with him. Finally, the fact that Langley was given a higher salary than Doherty in order to prevent him from leaving the Center and joining Presbyterian also does not create an "intolerable" working environment. As we have noted, Doherty's salary was not reduced by the reassignment of duties. Moreover, management asserted a valid non-discriminatory reason for Langley's higher salary and Doherty has not shown that the reason was a pretext for unlawful discrimination.

Doherty also points to a series of events beginning in February 1998 during which she was allegedly badgered, harassed, and encouraged to work part-time or take on fewer responsibilities as supporting her constructive discharge claim. Doherty's claim that Dr. Doody asked her to work part-time weeks before the reorganization and mentioned that she "regretted not spending more time with her child" is insufficient to create an environment in which any objectively reasonable person would feel compelled to resign. The other evidence presented by Doherty, while perhaps

revealing that she was not treated fairly or with the empathy she might expect, fails to show that she was ever threatened or humiliated in an "intolerable" way such that a reasonable person would have been "compelled" to quit.  Constructive discharge requires more than merely being dissatisfied with the job--indeed, it requires a showing of harassment greater than that necessary to establish a hostile work environment claim.  See Brown, 237 F.3d at 565.  Finally, we note that the fact that Doherty had inquired about a job at Presbyterian in December 1997, three months before the reorganization of duties at the Center, suggests that Doherty's decision to quit and accept a job at Presbyterian was not altogether dictated by the events of February and March of 1998 that form the basis of her claim.

Because Doherty failed to raise a genuine issue of material fact regarding constructive discharge under Title VII, the judgment of the district court is

A F F I R M E D