IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-21233

Summary Calendar
_____


BROOKE A. JACKSON, M.D.

Plaintiff-Appellant

v.


THE UNIVERSITY OF TEXAS M.D. ANDERSON CANCER CENTER; ET AL

Defendants

THE UNIVERSITY OF TEXAS M.D. ANDERSON CANCER CENTER

Defendant-Appellee

_____

Appeal from the United States District Court
for the Southern District of Texas
No. H-00-0531
_____

October 23, 2002

Before KING, Chief Judge, and BARKSDALE and STEWART, Circuit
Judges.

PER CURIAM:[*]

_____

[*]     Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

Plaintiff-appellant Brooke A. Jackson, M.D., appeals from the district court's decision granting summary judgment to defendant-appellee The University of Texas M.D. Anderson Cancer Center on Dr. Jackson's claims for constructive discharge and disparate treatment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2002e (2000). For the reasons set forth below, we AFFIRM the district court's grant of summary judgment to M.D. Anderson.

## I. FACTUAL AND PROCEDURAL BACKGROUND

From July 1998 to October 1, 1999, Dr. Brooke A. Jackson, an African-American female, was employed by The University of Texas M.D. Anderson Cancer Center ("M.D. Anderson"), a branch of the University of Texas system. Dr. Jackson is qualified to perform a specialized surgical technique for removal of skin cancers known as Mohs Micrographic Surgery ("Mohs"). Dr. Madeline Duvic was Chief of the Dermatology Section of M.D. Anderson and also Dr. Jackson's supervisor. Dr. Robert F. Gagel was Chairman of the Department of Internal Medicine of Specialities of M.D. Anderson and Dr. Duvic's supervisor.

Dr. Jackson took part in an interview designed to select who would start up and lead the Mohs Unit at M.D. Anderson. Dr. Duvic was authorized to oversee the interviewing of candidates for the position. In the Spring of 1998, Dr. Duvic narrowed the field of candidates to direct the Mohs surgery unit to Dr.

2

Jackson and Dr. Michelle Algarin. Dr. Jackson was ultimately offered the position. During the interview process, Drs. Duvic and Jackson discussed the terms of Dr. Jackson's potential employment, including the possibility of Dr. Jackson developing the Mohs Surgery Unit and serving as its director. Dr. Jackson contends that Dr. Duvic stated during their meeting that her salary would be $160,000 per annum and the appointment would serve as a tenure-track position. Dr. Jackson reports that Dr. Duvic did not object to Dr. Jackson's interest in pursuing a private cosmetic surgery practice outside of M.D. Anderson. In response, Dr. Duvic maintains that all of these topics were only discussed in general terms during this interview. Dr. Duvic also specifies that she did not have final authority to grant any of the requests and that she did not make any guarantees to Dr. Jackson regarding the requests.

On July 23, 1998, shortly after Dr. Jackson began her employment with M.D. Anderson, she was given a formal offer letter stating the terms and conditions of her employment ("Offer Letter"). The Offer Letter indicated that her position at M.D. Anderson was on an ad interim basis, that her salary was to be $150,000 per annum, that she was to be given a one-year nonrenewable term of employment, and that she would receive a non-tenured clinical appointment. Soon after her receipt of the Offer Letter, Dr. Jackson realized that she would be unable to pursue a cosmetic surgery practice independent of M.D. Anderson

3

under the terms of the Physicians Referral Service ("PRS") agreement, which generally prohibits physicians from taking fees for services outside of their employment contract.

Dr. Duvic eventually agreed to redact the "nonrenewable" language from the Offer Letter, telling Dr. Jackson that she had no plans to "get rid" of her. Dr. Duvic also stated that she would attempt to have Dr. Jackson's salary raised to $160,000 per annum but that the administrators of the plastic surgery and head and neck departments had objected to a Mohs surgeon's salary being at that amount. Troubled by these alleged changes of workplace conditions, on September 10, 1999, Dr. Jackson resigned from her employment at M.D. Anderson, effective October 11.

On February 18, 2000, Dr. Jackson filed suit, naming M.D. Anderson, Dr. Duvic, and Dr. Gagel as defendants. Her lawsuit alleged breach of contract, constructive discharge in violation of Title VII and general workplace discrimination in violation of Title VII. It was not until July 14, 2000, that Dr. Jackson filed her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Dr. Jackson a right to sue notice on January 21, 2001. In the meantime, the Defendants filed motions to dismiss and for summary judgment. On April 12, 2001, the district court dismissed all of Dr. Jackson's claims except for those arising under Title VII. On June 4, 2001, Jackson filed a Third Amended Complaint specifying her

4

claims, thereafter alleging race-based disparate treatment under Title VII.

On July 30, 2001, M.D. Anderson and the other named defendants moved for summary judgment as to Dr. Jackson's Title VII claims, arguing that: (1) Dr. Jackson had insufficient evidence to support her claims; (2) M.D. Anderson's conduct toward Dr. Jackson was based on legitimate, nondiscriminatory reasons; (3) M.D. Anderson treated Dr. Jackson as it would have treated any other similarly situated Caucasian or male; and (4) Dr. Jackson did not timely file her charge of discrimination with the EEOC.

In its Memorandum and Order of October 30, 2001, the district court awarded summary judgment in favor of M.D. Anderson, finding that Dr. Jackson had failed to raise a genuine issue of material fact on any aspect of her claim for disparate treatment. The court further concluded that Dr. Jackson had failed to timely file her charge of discrimination on all claims save for her constructive discharge claim. In the interests of justice, the court also raised, <u>sua sponte</u>, the issue of whether Dr. Jackson had endured a continuing violation, and deemed this possible cause of action without merit. As to her claim for constructive discharge, the court dismissed that claim with prejudice, finding that Dr. Jackson had failed to raise a triable issue of fact.

Dr. Jackson timely appeals the district court's grant of summary judgment on her Title VII constructive discharge and disparate treatment claims.[1]

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment to M.D. Anderson de novo, applying the same standard as the district court, e.g., Brown v. Bunge Corp., 207 F.3d 776, 781 (5th Cir. 2000), and ask whether the pleadings, depositions, and answers to interrogatories, together with the affidavits, demonstrate that no genuine issue of material fact remains and that the moving party is entitled to judgment as a matter of law. E.g., Boze v. Branstetter, 912 F.2d 801, 804 (5th Cir. 1990); FED. R. CIV. P. 56(c). A factual dispute is genuine when a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986).

The substantive law dictates which facts are material, Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), and an issue is material if its resolution could affect the outcome of the action, Anderson, 477 U.S. at 248. Moreover, in summary judgment determinations, the factual record is reviewed in such a

---

[1] This court need not address whether plaintiff raised a genuine issue of material fact regarding the existence of a continuing violation. Dr. Jackson waived review of these issues by not incorporating them into the Argument of her Brief. See, e.g., Sherrod v. Am. Airlines, 132 F.3d 1112, 1119 n.5 (5th Cir. 1998) (citing cases and FED. R. APP. P. 28).

way that all inferences are drawn in the light most favorable to the party opposing the motion.  E.g., Jurgens v. EEOC, 903 F.2d 386, 388 (5th Cir. 1990).  Accordingly, we review the evidence most favorably to Dr. Jackson.


III. DR. JACKSON'S DISPARATE TREATMENT CLAIM

Dr. Jackson claims that she was subjected to disparate treatment based on racial animus at the time of her resignation. Ultimately, these claims depend on whether she followed the correct procedure in bringing the cause of action to federal court.  Any claim for relief under Title VII, ab initio, must be based on a charge of discrimination that was filed within the Title VII statute of limitations period.  See 42 U.S.C. 2000e-5(e)(1) (2000). Failure to file a discrimination charge with the EEOC or the appropriate state department or commission  bars a plaintiff from pursuing a discrimination lawsuit under Title VII. Hence, we must evaluate whether Dr. Jackson satisfied the statutory prerequisites to suit before we can consider the merits of her assertions of race-based disparate treatment while in the employ of M.D. Anderson.

On appeal, M.D. Anderson argues that the district court was correct in finding that Dr. Jackson's claims were untimely.  M.D. Anderson further contends that the time period for filing a discrimination charge in Texas is 300 days, and that Dr. Jackson's only timely cause of action is her constructive

7

discharge claim.  Dr. Jackson, in response, argues that she was discriminated against "right up to the day in which she walked out the doors of M.D. Anderson."  She does not address M.D. Anderson's specific points regarding the appropriate statutory period, nor does she attempt to characterize a particular discriminatory event as having occurred within that period.

The Supreme Court's recent opinion in National Railroad Passenger Corp. v. Morgan, - - U.S. - - -, 122 S. Ct. 2061 (2002), outlines the requirements for the timely filing of discrimination charges under Title VII.  In Morgan, the Supreme Court stated that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  Id. at 2072.  Under the Court's Title VII standard, each incident of discrimination and of retaliatory employment action is a separate legally-cognizable employment action.  Id. at 2073.  Only those incidents that took place within the timely filing period can be deemed actionable under the statute.  Id.

As each and every discrete discriminatory action "starts a new clock for filing charges alleging that act," a plaintiff's discrimination charge is required to be filed within the 180- or 300-day time period after the occurrence of that action.  Id. at 2072.[2]  When a plaintiff's cause of action stems out of incidents

_____

[2]  In so reasoning, the Morgan Court distinguished Title VII claims stemming from discrete incidences of discrimination

8

occurring in Texas, filing a claim of discrimination with the EEOC is tantamount to filing with the Texas Commission on Human Rights ("TCHR"). See, e.g., Vielma v. Eureka Co., 218 F.3d 458, 462-63 (5th Cir. 2000) ("When a complainant filed her initial charge with the EEOC, her charge will also be filed with the TCHR."). Under the Worksharing Agreement between the EEOC and the TCHR, the time period to file discrimination charges with the EEOC is 300 days. E.g., Griffin v. City of Dallas, 26 F.3d 610, 612 (5th Cir. 1994).

Thus, for Dr. Jackson to avoid having time-barred claims, she must identify discrete instances of discrimination that occurred no more than 300 days prior to the day on which she filed her EEOC charge. Since she filed her charge on July 14, 2000, all actionable discriminatory conduct must have occurred on or after September 13, 1999.

The vast majority of the alleged discrete discriminatory actions in the instant case occurred when Dr. Jackson discovered that she was not going to receive what she thought Dr. Duvic promised her during the initial interview. Dr. Jackson did not review the Offer Letter until July 23, 1998. Even if the latest

---

from claims arising out of an hostile work environment. Because a hostile work environment is statutorily defined as a series of separate acts that collectively constitutes a single "unlawful employment practice," the Court reasoned that the entire time period of the hostile work environment can be considered by a court in determining liability. Id. at 2074. Dr. Jackson does not allege hostile environment in the instant case.

9

of these actions "started a new clock," these events were far outside the 300-day window of opportunity provided under the statute of limitations.[3] Although she contends that she endured race-based discrimination until her last day of employment at M.D. Anderson, Dr. Jackson does not offer specific dates or other chronologically-descriptive terms when identifying discrete discriminatory actions. A thorough examination of the record reveals that the only alleged discrete action to occur within that 300-day window of opportunity is her resignation from M.D. Anderson.

Dr. Jackson's failure to file her claim in a timely manner, given the Morgan Court's continued insistence on punctuality, forecloses the possibility of liability on the part of M.D. Anderson on all claims other than her constructive discharge cause of action. Although the district court elected to examine the merits of the disparate treatment claim, notwithstanding the expiration of the statute of limitations, this court need not do so.

The district court's grant of summary judgment as to the disparate treatment claims was proper. As a result, the only remaining issues in this cases revolve around Dr. Jackson's alleged constructive discharge.

---

[3] In fact, other than her resignation, Dr. Jackson's last discrete discriminatory act occurred 417 days prior to September 13, 1999.

10

IV. JACKSON'S CONSTRUCTIVE DISCHARGE CLAIM

On appeal, Dr. Jackson also contends that she endured a series of humiliations while working at M.D. Anderson. This series of events, she asserts, created an atmosphere causing her to conclude that she had no option other than resigning her employment at M.D. Anderson. Under Title VII, a resignation is actionable, allowing the plaintiff to seek compensatory damages, only if the resignation qualifies as a constructive discharge. See Brown v. Kinney Shoe Corp., 237 F.3d 556, 566 (5th Cir. 2001). We will evaluate Dr. Jackson's claims by examining the standards previously enunciated by this court.

The Fifth Circuit has set the bar very high for plaintiffs seeking to establish a constructive discharge. See, e.g., id. at 566 (citing Benningfield v. City of Houston, 157 F.3d 369, 378 (5th Cir. 1998)) ("Constructive discharge requires a greater degree of harassment than that required by a hostile work environment claim."). We apply the reasonable employee standard in this particular context: To establish a constructive discharge, Dr. Jackson must establish that "working conditions were so intolerable that a reasonable person would feel compelled to resign." E.g., Brown, 237 F.3d at 566; Brown, 207 F.3d at 782; Ward v. Bechtel Corp., 102 F.3d 199, 202 (5th Cir. 1997).

Although whether a reasonable employee would feel compelled to resign is a somewhat fact-dependent inquiry, this court's decision in Barrow v. New Orleans Steamship Ass'n, 10 F.3d

11

292(5th Cir. 1994), listed the following claim-triggering events to assist courts in evaluating when constructive discharge is alleged: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not. Id. at 297, quoted in Brown, 237 F.3d at 566; Brown, 207 F.3d at 782. These events are considered singly or in combination, i.e., a single, greatly significant event may be sufficient to create an intolerable situation, as can several, less egregious events working in tandem. See id.

Inherently, evaluation of a claim of constructive discharge demands an extensive review of the practices, events, and conditions at a given workplace that have allegedly compelled a plaintiff to resign.[4] Dr. Jackson contends that her series of

---

[4] It is for this reason that the events allegedly supporting Dr. Jackson's constructive discharge claim do not suffer the same statute of limitations problems that plague her disparate treatment claims. Similar to a hostile work environment cause of action, a claim for constructive discharge can be described as a singular employment practice involving a series of repeated acts that are so severe and pervasive that they permeate the workplace. Cf. Landgraf v. USI Film Prods., 968 F.2d 427, 429-30 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity and pervasiveness than the minimum required to prove a hostile work environment."). Although the Morgan Court did not discuss the

12

humiliations endured while working at M.D. Anderson included: her contract being for a one-year term only; the fact that she was being placed on a non-tenure track with the University of Texas Medical School; her discovery of a memorandum from Dr. Gagel to Dr. Duvic that allegedly memorialized their scheme to hire Dr. Jackson on a temporary basis until a less qualified white physician could achieve the required training to assume the position; and the requirement that she work without proper pay or resident support.[5]

M.D. Anderson agrees with the trial court's assessment of the constructive discharge claim, specifically that at worst, Dr. Jackson's failure to receive tenure track position and inability

---

implications of its rationale on the constructive discharge theory of discrimination, the only post-Morgan decision considering this issue supports our basic assessment. See Marrero v. Goya of P.R., Inc., - - - F.3d. - - -, No. 01-1984, 2002 WL 1962144, at *15 (1st Cir. Aug. 28, 2002) ("Just as an act of harassment that is not actionable in and of itself may form part of a hostile work environment claim, [plaintiff]'s experiences during her last week of work—although insufficient to establish liability on their own—are properly part of her constructive discharge claim.")(citing Morgan, 122 S. Ct. at 2073).

[5]  Dr. Jackson also alludes to the reports of Dr. Vickie Shannon, an African-American colleague, who also made complaints of disparate treatment while working under Dr. Gagel's supervision.  Dr. Jackson asserts that Dr. Shannon's complaints are relevant to her because they provided Dr. Jackson reason to believe that her situation working with Dr. Gagel would not change and thus, she would have no alternative but to resign. Although this evidence may go toward explaining Dr. Jackson's thought processes in deciding to resign, it is irrelevant because there is no explanation of why another person's experiences could indirectly make Dr. Jackson's working conditions so intolerable that a reasonable person would be compelled to resign.

13

to pursue a private cosmetic surgery practice were examples of disparate treatment, but not intolerable working conditions. M.D. Anderson argues that Dr. Jackson's claims as to pay and resident support do not support her claim for constructive discharge and that she was treated in the same way as other full-time physician employees, especially in regard to the PRS Agreement.

After an exhaustive examination of the summary judgment record, we find that Dr. Jackson has failed to adduce evidence that her decision to resign amounted to a constructive discharge based on any of the factors identified in <u>Barrow</u>. Her best arguments under the <u>Barrow</u> factors, had she attempted to assert them, would fall short. Making a reasonable inference in Dr. Jackson's favor, we could assume that Dr. Jackson received less pay than originally promised. However, this would not constitute a reduction in pay because she began her employment at the salary of $150,000 per annum; while under the employ of M.D. Anderson, no actual reduction in salary occurred. In fact, she received a pay raise of $10,000 only thirty-four days after beginning work for M.D. Anderson. Further, the lack of proper staff does not, as argued, constitute a demotion of any kind or implicate any other <u>Barrow</u> event. Even if, <u>arguendo</u>, Dr. Jackson did lose some responsibilities perhaps implicating another of the <u>Barrow</u> factors, a mere change in responsibilities, without more, will not support a claim for constructive discharge. <u>Epps v. NCNB</u>

14

Tex., 7 F.3d 44, 46 (5th Cir. 1994).[6]  Taken as a whole or individually, the employment actions in the instant case do not compare in kind or degree to those articulated in Barrow.

Although the list of Barrow factors is non-exclusive, Ward, 102 F.3d at 202, Dr. Jackson has failed to present any other workplace characteristics sufficient to create a genuine issue of material fact that a reasonable employee would consider her work environment at M.D. Anderson intolerable.  Despite the fact that Dr. Jackson is not required to offer proof that it was M.D. Anderson's intention to force her to resign, e.g., Jurgens, 903 F.2d at 390, she nevertheless argues that her supervisors at M.D. Anderson conspired to have a white doctor replace her.  In the light most favorable to Dr. Jackson, this argument is still problematic because Dr. Jackson fails to allege any aggravating factors.  Brown, 237 F.3d at 566; Boze, 912 F.2d at 805 (stating that discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge).  The fact that nothing ever came of this alleged conspiracy to replace Dr. Jackson is additionally pertinent because a "remote possibility" of an adverse employment action would not make a reasonable employee feel compelled to resign.  Jurgens, 903 F.2d at 392-93.

Given the high standard that this court has set for

---

[6]  Moreover, several events suggest that she did not suffer a responsibility loss, as Dr. Jackson was made the Director of the Mohs Surgery Unit, and was given the responsibility to establish the unit at M.D. Anderson.

establishing a constructive discharge, it is clear that Dr. Jackson failed to proffer the evidence necessary to raise a genuine issue of material fact supporting her claim.

## V.   CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.