**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 99-60144

DOUGLAS BROWN,

Plaintiff-Appellant,

v.

BUNGE CORPORATION; CLAUDE ROSE,
individually and as operations
manager, Vicksburg Facility,

Defendants-Appellees.

Appeal from the United States District Court
For the Southern District of Mississippi

March 28, 2000

Before GARWOOD, WIENER and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Douglas Brown, the plaintiff/appellant, filed suit against Bunge Corporation (Bunge) alleging discrimination on the basis of his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and alleging state law tort claims of negligent and intentional infliction of emotional distress and breach of contract. The district court granted Bunge's motion for summary judgment and dismissed Brown's claims with prejudice. For the reasons assigned, we affirm the decision of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Brown began working for Bunge's Soybean Processing Plant in

1

Vicksburg, Mississippi in 1966.[1]  The Vicksburg plant has three departments – maintenance, processing, and shipping and receiving – each of which is managed by a superintendent.  In 1975, Brown was promoted to the position of superintendent of the shipping and receiving department.  He served in this capacity until January 1997.

Claude Rose served as operations manager of Bunge's South Central region where he was responsible for monitoring four of Bunge's soybean processing facilities including the Vicksburg plant.  The Vicksburg plant was the least profitable of Bunge's soybean processing facilities.  In 1996, Rose became operations manager of the Vicksburg plant and was directed to improve plant operations.  As operations manager, Rose supervised the three superintendents at the Vicksburg plant: Brown; Roger Blades, superintendent of the processing department; and Paul Buford, superintendent of the maintenance department.

Rose stated that he regularly met with Brown, Blades and Buford concerning problems at the Vicksburg plant.  Rose concluded that Brown's department was the most poorly managed department at the plant because of Brown's inability to solve problems, train and supervise employees, and deal with uncooperative employees. According to Rose, he held individual meetings with Brown where he informed Brown of the need to correct these deficiencies.  Rose kept no documentation of these meetings, however.

---

[1]The Anderson Clayton Company owned the Vicksburg plant when Brown became an employee in 1966; Bunge subsequently purchased the Vicksburg plant from the Anderson Clayton Company.

During a meeting on January 22, 1997, Rose met with Brown to implement a Performance Improvement Plan (PIP), a disciplinary program for salaried Bunge employees who were experiencing performance problems. Brown received a PIP letter listing his performance deficiencies and directing him to prepare a written response with suggestions for correcting each deficiency. The PIP letter stated that if Brown failed to show "immediate and sustained improvement in all areas of [his] performance" he might be unable to continue working at Bunge. The PIP letter also stated that Brown and Rose were to meet on January 27 to discuss Brown's response to the PIP.

Brown was shocked when he received the PIP letter because he was unaware that Rose had any problems with his performance prior to this meeting. While Brown acknowledged that he had discussed problems in the shipping and receiving department with Rose, Brown believed the problems were caused by insufficient financial resources rather than deficiencies in his management skills. According to Brown, the problems could not be corrected without additional staff and equipment but Bunge had rejected his requests for more resources.

Brown was also surprised that the PIP letter focused on problems with his management skills because he had received a raise in January 1996 and January 1997. The last increase was awarded several weeks before Brown received the PIP letter. In addition, Rose praised Brown at a Bunge function honoring long-term employees in December 1996. Brown stated that Rose would not have

3

recommended that he receive a raise or publicly compliment him if Rose was displeased with his performance.

Brown was aware that a similar letter had been given to another Bunge employee who had ultimately been terminated. Brown believed that PIP letters were used by Bunge to "get rid of" employees and that he had received a PIP letter because the company wanted to humiliate him in an effort to coerce him to retire or resign. Brown became very upset after meeting with Rose on January 22 because he believed he was incapable of correcting the problems in his department without additional resources which Bunge failed to provide. The next day, Brown gave Rose a letter announcing his retirement. Rose told Brown that the PIP letter was not designed to lead to Brown's retirement and that he was willing to help Brown become a more effective manager. Despite Rose's assurances, Brown requested permission to take a four week vacation and reiterated his decision to retire. Rose granted Brown's leave request and began to process his written request to retire.

Brown went into a deep depression during his four week vacation which required psychological therapy. When the vacation ended, Brown was unable to return to work given his emotional condition. Brown's psychologist notified Rose that Brown was suffering from major depression which rendered him unable to work so Bunge placed Brown on paid disability leave. Brown's extended absence left the shipping and receiving department without a superintendent from January 27, 1997 to April 1, 1997. Bunge management decided that the department needed a superintendent so

4

Rose appointed Joe Branch as temporary superintendent in April 1997. Branch was named permanent superintendent of the shipping and receiving department in June 1997; Rose said he made this appointment since he did not know if Brown would be able to return to work. According to Brown, Rose knew he was going to return to work when Branch became the permanent superintendent. Bunge had a policy of terminating any employee who was unable to work after 26 weeks of disability during any 52 week period. Brown's 26 week period was scheduled to expire on September 5, 1997; if he did not return to work by that date, he would be forced to either retire or face termination. Brown's wife stated that she informed a Bunge manager that Brown was going to return to work by September 5. She asserts that this conversation took place before Rose appointed Branch as permanent superintendent.

Brown was 55 years old in 1997. Branch, who replaced him as superintendent of the shipping and receiving department, was 41 years old at the time of his appointment. After Branch was named permanent superintendent, Brown filed an age discrimination charge with the Equal Employment Opportunity Commission (EEOC). Brown returned to work on Friday, September 5 and was given the job of a supervisor in the processing department under the direction of Blades. According to Bunge managers, they thought Brown might be overwhelmed by the responsibilities and stress associated with managing a department so they selected a less taxing position. Brown's new position involved a reduction in responsibilities but not in salary or benefits.

On the morning of September 5, shortly after Brown returned to work following an eight month absence, he had a meeting with Rose. Rose informed him that he was still subject to the terms of the PIP letter he had received in January 1997, which would be revised to reflect his new duties in the processing department. Brown completed his assignments that day but had difficulty eating and sleeping that weekend. Brown was unable to return to work on Monday, September 8 because the symptoms associated with his depression returned. Brown believed he suffered a relapse as a result of his meeting with Rose which was designed to intimidate him into retiring. Following a three week absence, Brown notified Bunge in writing that he was retiring on September 29, 1997.

In November 1997, Brown filed an additional charge with the EEOC alleging that Bunge and Rose retaliated against him when he returned to work on September 5. Brown sued Bunge and Rose and the district court granted Bunge's motion for summary judgment. After the district court entered a final judgment, Brown appealed.

## II.  STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment *de novo*, applying the same standard as the district court. See Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 725 (5th Cir. 1995). Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Questions of fact are viewed in the light most favorable to the nonmovant while questions of law are reviewed *de novo*. Id.

## III.  DISCUSSION

6

Title VII prohibits an employer from failing or refusing to hire or discharge an individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA proscribes similar treatment on the basis of age. 29 U.S.C. § 623(a)(1). The same evidentiary procedure for allocating burdens of production and proof applies to discrimination claims under both statutes. See Meinecke v. H & R Block, 66 F.3d 77, 83 (5th Cir. 1995) (per curiam). Initially, the plaintiff must establish a *prima facie* case of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). To establish this *prima facie* case, the plaintiff must prove that he is a member of a protected class, he was qualified for the position that he held, he was discharged, and after his discharge was replaced with a person who is not a member of the protected class. Meinecke, 66 F.3d at 83 (citation omitted). The first three elements of a *prima facie* case of age discrimination under the AEDA and discrimination under Title VII are identical. See Bodenheimer v. PPG Indus., Inc., 5 F.3d 955, 957 (5th Cir. 1993). For the fourth element in an age discrimination case, the plaintiff must show that "he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." Id.

Establishing a *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 525, 113 S.Ct. 2742,

7

125 L.Ed.2d 407 (1993); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981); Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 992 (5th Cir. 1996) (en banc). This presumption places on the defendant the burden of producing evidence that the challenged employment action was taken for a legitimate, nondiscriminatory reason. See Hicks, 509 U.S. at 507, 113 S. Ct. 2742; Burdine, 450 U.S. at 254, 101 S. Ct. 1089; Rhodes, 75 F.3d at 992-93. The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, "*if believed by the trier of fact*," would support a finding that unlawful discrimination was not the cause of the employment action. Hicks, 509 U.S. at 507, 113 S. Ct. 2742; Burdine, 450 U.S. at 254-55, 101 S. Ct. 1089; Rhodes, 75 F.3d at 993.

If the defendant succeeds in carrying its burden of production, the presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture, and the trier of fact proceeds to decide the ultimate question of whether the plaintiff has proved that the defendant intentionally discriminated against him. See Hicks, 509 U.S. at 511, 113 S. Ct. 2742; Burdine, 450 U.S. at 253, 101 S. Ct. 1089; Rhodes, 75 F.3d at 993. The plaintiff now must have "'the full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision'", and that unlawful discrimination was.

8

<u>Hicks</u>, 509 U.S. at 507-08, 113 S. Ct. 2742 (quoting <u>Burdine</u>, 450 U.S. at 256, 101 S. Ct. 1089); <u>see</u> <u>Rhodes</u>, 75 F.3d at 993.

Bunge argues that Brown did not establish his *prima facie* case of age discrimination because neither Bunge nor Rose discharged Brown. Brown submitted a letter of resignation in January 1997 after meeting with Rose to discuss some deficiencies in his performance. Although Rose attempted to assure Brown that the company did not want him to resign, Brown refused to withdraw his resignation. Following an eight month leave of absence, Brown returned to work for one day before taking three additional weeks of leave and announcing his retirement for a second time. We agree with Bunge that Brown did not meet the elements of his *prima facie* case because he was not discharged by the company.

Although Brown was unable to prove that Bunge fired him, the fact that he resigned does not end our analysis. When an employee resigns, he may satisfy the discharge requirement by proving constructive discharge. <u>See</u> <u>Barrow v. New Orleans Steamship Ass'n</u>, 10 F.3d 292, 297 (5th Cir. 1994). To prove constructive discharge:

> an employee must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign. Stated more simply, [Brown's] resignation must have been reasonable under all the circumstances. Whether a reasonable employee would feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status] . . . .

9

<u>Id.</u>

According to <u>Barrow</u>, the constructive discharge factors are considered "singly or in combination." Brown clearly proved two of the constructive discharge factors: when he returned to work as a supervisor in the processing department, this represented a demotion and involved fewer job responsibilities than serving as superintendent of a department. On the other hand, four of the constructive discharge factors were not present. Brown did not experience a reduction in salary or benefits in his new position. Brown's reassignment did not involve menial or degrading work; he still supervised staff although fewer people reported to him. Although Brown was assigned to work under a younger supervisor, this factor lacks any substantial weight under the particular circumstances of this case. In his new position, Brown was supervised by Blades, who was three years younger than him. Blades was essentially Brown's peer given that he was 52 years old and he was also a personal friend of Brown. Because Brown was not forced to report to a much younger supervisor but to a peer and friend of longstanding, this factor was not significant in affecting Brown's working conditions. <u>Cf.</u> <u>Guthrie v. Tifco Industries</u>, 941 F.2d 374, 377 (5th Cir. 1991), <u>cert. denied</u>, 503 U.S. 908 (1992) (stating employee proved *prima facie* case by showing constructive discharge where he was demoted, his salary was cut and he was reassigned to work for a man 17 years younger whom he had helped train).

Brown argues that because of Rose's harassment he was forced to choose between alternatives that were both less favorable than

10

his former status. Brown contends that Rose met with him the day he returned from an extended leave of absence in order to harass him into resigning. Although the timing of Rose's actions may have been insensitive, there is no objective evidence that Rose intended to badger, harass or humiliate Brown. The original PIP letter noted problems with Brown's ability to supervise his subordinates. Since his new position involved supervising several employees, Rose reminded Brown that the problems noted in January 1997 would still need to be corrected, as modified by the demands of his new position. The evidence of record does not support a reasonable inference that the discussion between Rose and Brown constituted harassment or humiliation. After considering the record, briefs and the parties' oral arguments, we cannot conclude that Brown's working conditions were so intolerable that a reasonable employee would have felt compelled to resign.

## IV. CONCLUSION

For the foregoing reasons, the district court's judgment is AFFIRMED.