IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-50506

Summary Calendar
_____

JANINE IRVINE

　　　　　　Plaintiff - Appellee

　　v.

EL PASO HEALTHCARE SYSTEM, LTD, doing business as Columbia
Healthcare

　　　　　　Defendant - Appellant

_____

Appeal from the United States District Court
for the Western District of Texas
No. EP-99-CR-186-DB
_____
February 23, 2001

Before KING, Chief Judge, and WIENER and DENNIS, Circuit Judges.

PER CURIAM:[*]

　　Defendant-Appellant Columbia Healthcare appeals from the

district court's denial of its motion for judgment as a matter of

law on Plaintiff-Appellee Janine Irvine's claim of constructive

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

discharge under Title VII.  For the reasons stated below, we AFFIRM.

# I. FACTUAL AND PROCEDURAL HISTORY[1]

From October 1995 until her resignation in August 1998, Janine Irvine worked for Columbia Healthcare ("Columbia") as the Manager of Financial Systems in the Information Systems ("IS") Department[2] in El Paso, Texas.[3]  A few months after Irvine began to work at Columbia, Clifton Scott was hired as the Manager of Technical Support for the IS Department.  Both Irvine and Scott reported to Don Bandy, the Director of the IS Department, who in turn reported to Ann Pinkerton, Columbia's Senior Vice President

---

[1]  Columbia disputed many of Irvine's allegations.  We have noted those distinctions where appropriate.  However, for purposes of a motion for judgment as a matter of law, we must review the evidence in the light most favorable to the verdict.  See Scott v. Univ. of Miss., 148 F.3d 493, 503 (5th Cir. 1998).

[2]  For approximately eight months of that time, Irvine served as the Interim Manager of Clinical Systems as well.

[3]  The evidence could indicate, however, that Irvine was not in fact the Manager of Financial Systems at the time of her resignation.  On the one hand, Irvine stated in her letter of resignation that she was "resigning [her] position as Manager Financial Systems" and admitted that even after the reorganization of the IS Department she was still a manager.  However, the jury was also presented with evidence of a revised Department reorganization chart, which indicated that Irvine was in charge of "special projects" and that Roman Castaneda was responsible for "Clinical/Financial."  Furthermore, other employees stated that they considered Irvine to have been demoted.  The jury could reasonably infer from this evidence that Irvine was no longer the Manager of Financial Systems after the reorganization.

of Finance.  By early 1998, when Bandy and Pinkerton both left El Paso, there were a total of four managers in the IS Department: Irvine; Scott; Susan Aguilar, the Manager of Clinical Systems; and Roman Castaneda, the Manager of the Information Center.  Both Irvine and Scott applied for Bandy's position, and the position was ultimately awarded to Scott.[4]

Irvine alleges that prior to receiving this promotion, Scott had made several inappropriate sexual advances towards her.  These included calling her at home, following her car down the street, and giving her an astrological chart that details the love strategies that will sexually excite a Leo.  After receiving the promotion to Director of the IS Department, Irvine alleges that Scott continued his improper advances.  For example, before assuming his new responsibilities, Scott informed Irvine that it was her last chance to sleep with him before he became her boss.

---

[4]  Scott was promoted over Irvine even though Irvine had been with the company longer than Scott, had higher scores on her performance evaluations than Scott, and had received more awards than Scott.  However, Columbia argued that Scott was promoted because he performed better in the interview than Irvine and had an MBA, which Irvine did not.  The committee that selected Scott consisted of Doug Matney, the CEO of Columbia Medical Center—East; Hank Hernandez, the CEO of Columbia Medical Center—West; Roger Armstrong, the Chief Financial Officer assigned to Columbia Medical Center—East; and Stan Serimet, from Columbia's Central Group.
Armstrong was one of three employees whom Irvine alleged made improper sexual advances towards her.  Specifically, Irvine alleged that Armstrong asked her out on dates numerous times, even after she had indicated she had no romantic interest in him and that, on one occasion, he grabbed her, pushed her down on a staircase, and tried "to force himself on [her]."

Upon assuming the role of Director of the IS Department, Scott restructured the Department. Prior to the reorganization, Irvine and Aguilar, both women, had been the Manager of Financial Systems and the Manager of Clinical Systems, respectively. Scott consolidated those two positions into the new Manager Clinical/Financial Systems position and gave the position to Castaneda, a male and the prior Manager of the Information Center. This was done without a posting of the position description and without other candidates being allowed to compete for the position, in contravention of established Columbia policy. Also, as a result of the reorganization, Irvine was put in charge of Special Projects, and Aguilar was assigned to Patient Care Inquiry ("PCI"). Although still considered a "Manager" in the IS Department and still receiving the same salary, Irvine's role in the Department had changed. For example, prior to the reorganization, she supervised four employees who reported directly to her ("direct reports"). After the reorganization, she and Aguilar had zero direct reports; all of the direct reports reported to the two male managers.

In April 1998, both Aguilar[5] and Irvine made written complaints to Columbia's Human Resources Department.[6] Irvine specifically complained that she and two other female managers were affected by discriminatory treatment. Specifically, she asserted that the female managers were replaced by less qualified males and that she had effectively been demoted and relegated to performing job assignments below her capabilities. She claimed that a hostile work environment had been created by this "demotion"[7] and other discriminatory treatment, including being excluded from meetings and being denied access to information.[8]

---

[5] Aguilar complained that Scott's discrimination negatively affected the manner in which the rest of the Department treated her. Aguilar also noted that Scott had instructed Castaneda to write the job description for Castaneda's new position, thereby arguably allowing Castaneda to tailor the position to meet his qualifications. Furthermore, she contended that Castaneda was far less qualified for the position, having less experience in the area than the women and no supervisory experience. Finally, she noted that other women in the Department had also experienced discriminatory treatment.

[6] Theresa Cintron, another manager who reported to Scott, also filed a written complaint regarding Scott with the Human Resources Department in April 1998. In her complaint, she detailed several incidents of Scott's questionable behavior and expressed her concerns that Scott discriminated against female employees, behaved abusively towards employees in general, and had a problem with drinking in the workplace.

[7] See supra note 3.

[8] We also note that Irvine complained of the behavior of Felipe Perez. Perez is one of the other employees who Irvine alleged sexually harassed her. Irvine asserts he publicly referred to her breasts as "the twins" on twenty or thirty occasions. Perez testified he made the statement only once.
As further evidence to support her claims, Irvine contended that Perez spread unfounded rumors that she intended to get

Irvine had initially met with Armstrong to voice her complaints; however, he informed her that he would not interfere with Scott's decisions. Following the receipt of the written complaints, Columbia began an investigation of the allegations of discrimination. Bertha Prospero-Sipes, Columbia's Vice President of Human Resources, and Sally Walker, Director of Human Resources at Columbia Medical Center-West, conducted the investigation.

At the conclusion of the investigation, Prospero-Sipes issued a report. In her report, she stated that "[a]n investigation of the entire department took place . . . . Statments [sic] were taken from the majority of the IS department." The report concluded that the majority of the Department was happy with the changes and understood that Janine and Susan were no longer managers (even though Columbia contends that was not the case). "None of the women expressed any concerns with sex discrimination from [Scott] or the other staff."[9] Prospero-Sipes's recommendations for resolving the situation involved permitting all of the managers to apply for the new positions and specific suggestions for how to remove the

_____

married and leave El Paso. She asserted that these rumors negatively impacted her job, because it was believed she would not be continuing her employment with Columbia in El Paso.

[9] We note, however, that the organization chart indicates there were twenty people in the IS Department, including a total of five women. Two of those women were Aguilar and Irvine, who had complained. A third was Terri Cummings, who was Scott's girlfriend at the time.

women, namely Citron, Irvine, and Aguilar, from Scott's supervision. Additionally, she recommended that Scott receive a written warning, be expected to attend management training classes, and issue an apology to the women.[10] Ultimately, Prospero-Sipes informed Irvine and Aguilar that the company had reached the conclusion that no sex discrimination was taking place in the IS Department, but that the proper procedures for reorganizing the Department had not been followed.[11]

Ultimately, the decision was made to reopen the competition for the Manager Clinical/Financial position. However, Irvine was urged to apply for the position of Y2K Coordinator; Irvine contends that Matney urged her to take the Coordinator position because she had "little or no chance" of receiving the Manager Clinical/Financial position.[12] Although described as a lateral move, Irvine alleges that, while interviewing for the Coordinator position, she was told the move would involve a $20,000 pay

---

[10] We note that neither Irvine nor Aguilar was moved, no apology was ever issued, and neither Armstrong or Scott was sent to diversity training.

[11] A jury may have doubted the credibility of this conclusion given Prospero-Sipes's later email to Doug Matney regarding the situation, which stated, "I apologize if I seem a bit 'heated' however, it is still my contention that Roger [Armstrong] has no glue [sic] as to what the problem is/was, that he did anything wrong or that he will correct his behavior going forward, without YOU or someone at your level informing him of such."

[12] Matney denied making this statement.

cut.[13]  Feeling that she had been tricked into applying for the Coordinator position rather than the Manager position, Irvine returned to her office to inform Matney that she would be applying for the Manager position.[14]  When she went to discuss the situation with Scott, he allegedly told her that she would not have a job if she did not take the Coordinator position.

Irvine arrived at Scott's office at 10:00 a.m. on May 21, 1998, to interview for the Manager position.  At that time, no one from Human Resources was present, as had been promised, and Scott allegedly said, "Well, this is your interview.  Do you have anything to say?  It doesn't matter anyway.  Interview over.  Good-bye."  Irvine returned to her office and emailed Matney, Prospero-Sipes, and Walker to ask why no one from Human Resources had been present.  At 10:45 a.m., a second "professional" interview was conducted in the presence of Walker, but the position was again awarded to Castaneda.  From this point forward, Irvine contends that her duties were taken away from her and that she was assigned primarily clerical, rather than managerial, tasks.

---

[13]  Additionally, we note that the position had previously been offered to one of Aguilar's former direct reports, Sandra Lynn, who declined the position.

[14]  Irvine contends that, just before this conversation, Scott entered her office drunk and behaved in an aggressive and belligerent manner.

Scott's inappropriate behavior did not end upon his promotion; Scott continued to approach Irvine in her office while intoxicated. He made a number of threats to Irvine, which Irvine reported to Human Resources. Ultimately, Scott was arrested for aggravated assault on Columbia property against Terry Cummings, his girlfriend and an employee of Columbia. Irvine testified that after this event, she was concerned about her personal safety in light of Scott's prior threats and behavior towards her. In response to the threat potentially posed by Scott, Columbia posted security guards outside the building. Two weeks later, Scott was dismissed from Columbia.

On July 15, 1998, Irvine's counsel wrote to Columbia's counsel summarizing Irvine's allegations of sexual harassment and sex discrimination and offering to settle her claims for $150,000. Columbia did not investigate the claims raised in the letter or respond to the letter in any way. Irvine was absent from work from July 22 until August 11 for medical reasons[15] and resigned from work on August 21.

Irvine filed suit in state court against Columbia alleging hostile work environment sexual harassment and constructive discharge in violation of both state and federal law.[16] Columbia

---

[15] Irvine was under the care of two doctors. She alleges that the stress caused extreme hair loss, hives, and severe facial disfigurement.

[16] See infra note 17.

removed the case to federal court.  After Irvine presented her case, Columbia moved for judgment as a matter of law.  The district court granted the motion with respect to Irvine's state common law claim for "negligent continuation of employment," but denied the motion with respect to both of the discrimination claims.  After Columbia presented its case, it renewed its motion for judgment as a matter of law, which the court again denied.  After deliberation, the jury found against Irvine on the sexual harassment claim, but in her favor on the constructive discharge claim and awarded her $30,000 in compensatory damages and $150,000 in punitive damages.

Columbia again filed a renewed motion for judgment as a matter of law.  The court denied the motion, including the motion to set aside the punitive damages award, and entered judgment in favor of Irvine on the constructive discharge claim.  Columbia timely appeals.

## II. STANDARD OF REVIEW

"We review de novo the district court's ruling on a motion for judgment as a matter of law."  Brown v. Bryan County, 219 F.3d 450, 456 (5th Cir. 2000); see also Scott v. Univ. of Miss., 148 F.3d 493, 503 (5th Cir. 1998).  "Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient

10

evidentiary basis for a reasonable jury to find for that party on the issue.'" Reeves v. Sanderson Plumbing Prods., 120 S. Ct. 2097, 2109 (2000).

> A motion for judgment as a matter of law will be granted only if "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict. . . . On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied. . . ."

Brown, 219 F.3d at 456 (quoting Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), overruled on other grounds, Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir. 1997) (en banc)).

We view all of the evidence and draw all reasonable inferences in the light most favorable to the verdict. See Scott, 148 F.3d at 504. "[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." Reeves, 120 S. Ct. at 2110. However,

> although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

Id. at 2110 (internal quotations and citation omitted); see also Brown, 219 F.3d at 456.

11

"Although we review denial of a motion for judgment as a matter of law, we note that our standard of review with respect to a jury verdict is especially deferential." Brown, 219 F.3d at 456. "'We must not substitute for the jury's reasonable factual inferences other inferences that we may regard as more reasonable.'" Denton v. Morgan, 136 F.2d 1038, 1044 (5th Cir. 1998) (quoting Rideau v. Parkem Indus. Servs., Inc., 917 F.3d 892, 897 (5th Cir. 1990)); see also Boeing, 411 F.2d at 374-75.

### III. CONSTRUCTIVE DISCHARGE

Irvine asserted two sexual discrimination claims in violation of state and federal law[17]: hostile work environment sexual harassment and constructive discharge. Columbia contends that the district court erred by considering evidence of Irvine's sexual harassment, a claim rejected by the jury, in determining whether Irvine was constructively discharged. Furthermore, Columbia claims that the evidence was insufficient to support the constructive discharge claim.

---

[17] Irvine asserted violations of the Texas Commission on Human Rights Act ("TCHRA"), TEX. LAB. CODE ANN. §§ 21.001-21.306 (Vernon 1996), and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17 (1994). However, "[b]ecause one purpose of the Commission on Human Rights Act is to bring Texas law in line with federal laws addressing discrimination, federal case law may be cited as authority." Specialty Retailers, Inc. v. DeMoranville, 933 S.W.2d 490, 492 (Tex. 1996).

For purposes of this opinion, we need not determine whether Columbia's assertion that the hostile work environment sexual harassment evidence may not be considered in determining whether Irvine was constructively discharged. Assuming arguendo that Columbia is correct, the jury still had before it sufficient evidence on which to base its finding of constructive discharge.[18]

### A. Sufficiency of the Evidence

"To prove constructive discharge, a plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign." Faruki v. Parsons S.I.P., Inc., 123 F.3d 315, 319 (5th Cir. 1997). A showing of discrimination is not enough; an employee must also show "aggravating factors." Brown v. Kinney Shoe Corp., No. 99-50493, 2001 WL 1016, at *8 (5th Cir. Jan. 15, 2001); McCann v. Litton

---

[18] Because there is sufficient evidence to support the jury finding of constructive discharge without considering the hostile work environment sexual harassment evidence, we need not and do not, in fact, decide if such evidence was properly considered.

Contrary to Columbia's argument, we do not believe that this court's decision in Mattern v. Eastman Kodak Co., 104 F.3d 702 (5th Cir. 1997), mandates the exclusion of the sexual harassment evidence in this case. In Mattern, this court noted only that "the retaliation claim must be viewed in the context of these two jury findings adverse to Mattern." 104 F.3d at 706. In that case, however, a finding of retaliation was predicated on facts that could have been established only by a finding of sexual harassment or constructive discharge. The findings against the employee on those claims precluded the court from finding that the employee had, for example, suffered an adverse employment action. By contrast, in this case, Irvine's constructive discharge claim is not similarly dependent on a finding of hostile work environment sexual harassment. See infra note 21.

13

Sys., Inc., 986 F.2d 946, 951 (5th Cir. 1993); Jurgens v. EEOC, 903 F.2d 386, 391-92 (5th Cir. 1990).

The court must weigh several factors to determine if a constructive discharge has occurred. In Brown v. Bunge Corp., 207 F.3d 776 (5th Cir. 2000), this court listed a number of such relevant factors:[19]

> "Whether a reasonable employee would feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status]. . . ."

Id. at 782 (quoting Barrow v. New Orleans Steamship Ass'n, 10 F.3d 292, 297 (5th Cir. 1994)). However, "[t]he list of factors in Barrow is non-exclusive." Ward v. Bechtel Corp., 102 F.3d 199, 202 (5th Cir. 1997); see also Barrow v. New Orleans Steamship Ass'n, 10 F.3d 292, 297 (5th Cir. 1994).

Columbia asserts that the evidence presented by Irvine was insufficient to support the jury's finding of constructive

---

[19] Although Brown v. Bunge Corp., 207 F.3d 776 (5th Cir. 2000), and Barrow v. New Orleans Steamship Association, 10 F.3d 292 (5th Cir. 1994), are cases of discrimination alleged under the ADEA, the factors are equally relevant to Title VII cases. See, e.g., Brown, 2001 WL 1016, at *8 (listing the Barrow factors in the context of a Title VII case); Ward v. Bechtel Corp., 102 F.3d 199, 202 (5th Cir. 1997) (referencing the Barrow factors in a Title VII race discrimination case).

14

discharge.[20]  We disagree.  In light of our standard of review, we find that Irvine presented sufficient evidence to support the jury finding.  In viewing the cumulative condition of the work environment, a reasonable juror could have found that "working conditions were so intolerable that a reasonable employee would feel compelled to resign."  Faruki, 123 F.3d at 319.  Although Columbia disputed much of the evidence presented by Irvine, it is the role of the jury, not the court, to make credibility determinations.  See Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000); Denton v. Morgan, 136 F.3d 1038, 1044 (5th Cir. 1998).[21]

---

[20]  Columbia also argues that Irvine was required to prove that her working conditions were intolerable because of unlawful discrimination, which she could not do, given that the jury found against her on her sexual harassment claim.

An unlawful employment practice is established under Title VII "when the complaining party establishes that race, color, national origin, or sex was a motivating factor for any employment practice, even though other factors also motivated the practice."  Garcia v. City of Houston, 201 F.3d 672, 676 (5th Cir. 2000).  A finding of constructive discharge need not be predicated on a finding of hostile work environment sexual harassment to be unlawful.

The jury was instructed that it needed to find that Columbia intentionally made Irvine's working conditions "so intolerable that a reasonable person would feel forced to resign" and that Irvine's "sex was a motivating factor."  We find no error.

[21]  Columbia argues that because this circuit has found that "[t]o prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment," the jury's finding against Irvine on the hostile work environment sexual harassment claim mandates the conclusion that there is insufficient evidence to support a constructive discharge claim or, alternatively, is inconsistent with a finding in favor of Irvine on the constructive discharge claim.  See

Irvine presented evidence that she was repeatedly passed over for promotion in favor of less-qualified males. Furthermore, in the recent restructuring of her Department, she had been effectively demoted. Although her pay remained the same, her responsibilities and her direct reports had been taken away--even her coworkers testified that they believed she had been demoted. This happened not only to Irvine, but to the only other female manager in the IS Department. In fact, the two positions held by the women, Manager of Financial Systems and Manager of Clinical Systems, were combined into the new Manager Clinical/Financial position, and the new position was given to a male with no experience in either area. Additionally, the new position was filled without even allowing the women to apply for the position, in direct violation of company policy.

---

Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992); see also Weller v. Citation Oil & Gas Corp., 84 F.3d 191, 195 n.7 (5th Cir. 1996).

It is important, however, to look at that requirement in the context from which it was taken. The preceding sentence in Landgraf states: "Moreover, even if the reason for Landgraf's departure was the harassment by Williams, ... the level of harassment was insufficient to support a finding of constructive discharge." Landgraf, 968 F.2d at 430. Therefore, in a situation in which a plaintiff is relying on harassment evidence to prove constructive discharge, she must show a "greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment." Id. However, Irvine did not limit the evidence she presented on her constructive discharge claim to evidence of sexual harassment. As we will find that the evidence is sufficient to support the jury verdict of constructive discharge without relying on the sexual harassment evidence, Landgraf is inapplicable to this situation.

16

Although Columbia presents its investigation into the discrimination complaints as evidence of its good faith effort to comply with Title VII, the evidence could reasonably have been interpreted by the jury as establishing an environment in which complaints of discrimination were not taken seriously. After receiving written complaints from three out of the six women in the IS Department, the Human Resources Department conducted an investigation and found that no discrimination had occurred in the Department. Yet, after having found no discrimination in the IS Department, the Human Resources Department suggested moving all of the women who had complained out of the IS Department, offering diversity training to the men identified in the written complaints, offering apologies to all of the women involved, and having follow-up conversations with the men involved. Furthermore, the jury could have found an even more blatant disregard of Irvine's rights in that none of these recommendations was followed. Additionally, although the complaints had contained numerous references to Scott's alleged drinking problem and his abusive behavior towards all employees, but especially women, the investigation did not appear to address these issues in any manner.

After the investigation, the jury was presented with evidence that the discriminatory behavior continued, and in fact, more threatening behavior began. Not only did Scott continue to act abusively towards her, but he allegedly threatened to fire

17

her if she did not withdraw her application for the newly created Manager position. Instead, Irvine was encouraged by both Scott and Armstrong to apply for a "lateral" position as a Y2K Coordinator. However, she later found that the Coordinator position involved a $20,000 pay cut and had already been offered to her subordinate, potentially discrediting the testimony that the move was in fact lateral. Furthermore, her treatment within the IS Department continued to deteriorate as she was excluded from meetings and assigned primarily clerical work, rather than the managerial work she had done in the past.

Furthermore, Scott's drinking problem exacerbated his aggressive and abusive behavior. Ultimately, he assaulted his girlfriend, a coworker of Irvine's, resulting first in criminal charges against him and later in his dismissal from Columbia. Although Columbia asserts that no other women left because of this threat, and therefore, Irvine's reaction was not reasonable, the jury was also presented with evidence that the threat was sufficiently serious for Columbia to post security guards at the office.

We agree with the district court that the facts and inferences do not point so strongly and overwhelmingly in favor of one party that the court should overturn the jury verdict. A jury could find, in line with the factors identified in Barrows, that Irvine had been demoted, that she had a reduction in job responsibilities, that her new work was menial and degrading,

18

that a less-qualified male had been promoted over a more-qualified female, and that the treatment she received was calculated to encourage her resignation.  Additionally, a jury could find that Columbia's asserted investigation was not genuine, particularly given Columbia's failure to follow any of the recommendations made by Prospero-Sipes to remedy the situation.  Finally, a reasonable juror could find that Irvine reasonably feared that her "demotion" was a harbinger of dismissal and that she was in physical danger from Scott.  Cumulatively, the facts and inferences do not point so strongly and overwhelmingly in favor of Columbia that reasonable men could not arrive at a contrary verdict.[22]  Thus, Columbia's motion for judgment as a matter of law was properly denied.

## IV. PUNITIVE DAMAGES

Columbia argues that the district court erred in awarding punitive damages to Irvine because Columbia did not act with the malice required for punitive damages, and even if Scott did act with such required malice, punitive damages are not appropriate

---

[22]  Columbia correctly asserts that many of these factors alone cannot support a finding of constructive discharge. However, constructive discharge is determined by looking at the cumulative effect of the conditions on a reasonable employee. See McCann, 986 F.2d at 952 (finding that certain factors alone could not constitute constructive discharge); Jurgens, 903 F.2d at 392 (same); Bourque v. Powell Elec. Mfg. Co., 617 F.2d 61, 65 (5th Cir. 1980) (same).

in light of Columbia's good faith efforts to comply with Title VII.  Furthermore, Columbia asserts that even if punitive damages are appropriate, the $150,000 award is excessive in this case because Irvine suffered no economic loss.

<u>A. Appropriateness of Punitive Damages</u>

"A complaining party may recover punitive damages . . . if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1); <u>see also</u> TEX. LAB. CODE ANN. § 21.2585(b) (Vernon 1996); <u>Kolstad v. Am. Dental Ass'n</u>, 527 U.S. 526, 534-39 (1999); <u>Deffenbaugh-Williams v. Wal-Mart Stores, Inc.</u>, 188 F.3d 278, 281 (5th Cir. 1999) ("<u>Kolstad</u> explains, first, that no 'egregiousness' requirement exists for § 1981a(b)(1) punitive damages beyond the statutory 'malice' or 'reckless disregard' regarding actions' legality under Title VII.").

Furthermore, <u>Kolstad</u> adopted the <u>Restatement (Second) of Agency</u> § 217C for imputed liability for punitive damages to a principal for the acts of an agent.  <u>See</u> <u>Deffenbaugh-Williams</u>, 188 F.3d at 281-82.

> "Punitive damages can properly be awarded against a master or other principal because of an act by an agent, but only if:
> (a) the principal authorized the doing and the manner of the act, or
> (b) the agent was unfit and the principal was reckless in employing him, or

20

> (c) <u>the agent was employed in a managerial capacity and was acting in the scope of employment</u>, or
> (d) the principal or a managerial agent of the principal ratified or approved the act."

<u>Kolstad</u>, 527 U.S. at 542-43 (quoting RESTATEMENT (SECOND) OF AGENCY § 217C (1957)) (emphasis added). However, "such liability may <u>not</u> be imputed when the managerial agent's within the scope actions are 'contrary to the employer's good faith efforts to comply with Title VII.'" <u>Deffenbaugh-Williams</u>, 188 F.3d at 282 (quoting <u>Kolstad</u>, 527 U.S. at 545). We agree with the district court that Irvine presented sufficient evidence for the jury to have inferred that Scott was a manager acting within the scope of his employment; that Scott, as well as other employees, acted with "malice" and "reckless indifference" to Irvine's federal rights; and that Columbia's actions did not rise to the level of good faith efforts to comply with Title VII.

Columbia does not seriously dispute that Scott was a manager acting within the scope of his employment. "[W]hether an agent is a manager is a 'fact-intensive' inquiry." <u>Id.</u> at 285. Scott was the director of the IS Department. Upon taking the position, he instituted a reorganization, effectively demoted Irvine and Aguilar, promoted Castaneda, and shifted job responsibilities and direct reports. When Irvine complained about these actions to Armstrong, she was told that he would not interfere with Scott's decisions. Therefore, a jury could have found Scott's actions to be managerial and within the scope of his employment.

21

"The terms 'malice' and 'reckless' ultimately focus on the actor's state of mind." Kolstad, 527 U.S. at 535. "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Id. at 535. The district court did not err in concluding that Scott's discriminatory restructuring of the Department and his aggressive and abusive conduct were sufficient for a reasonable juror to find that he acted with malice.

Finally, the jury could have found that although Columbia had a anti-discrimination policy in place and conducted an investigation, the manner in which the investigation was conducted and the remedial action taken established that those actions were not conducted in good faith and that Columbia acted with reckless indifference to Irvine's federal rights. After its investigation, Columbia concluded no sexual harassment had taken place in the IS Department, notwithstanding written complaints from three of the six women in the Department. Additionally, the jury could consider evidence that although the Human Resources Department found that no sexual harassment had occurred in the Department, Prospero-Sipes recommended that the women be moved, that the men attend diversity training, that apologies be given, and that someone should speak to the men involved because they were unaware that they had done anything wrong. Furthermore, none of those recommendations was followed. Given this evidence,

22

the jury could have "infer[red] that any [employer] policy against discrimination was too poorly enforced to distinguish" Columbia's actions from Scott's.  Deffenbaugh-Williams, 188 F.3d at 286.

Therefore, we agree with the district court that the evidence, considered in a light most favorable to Irvine, does not point so strongly in Columbia's favor that reasonable jurors should find punitive damages inappropriate.

### B. Excessiveness of Punitive Damage Award

Columbia's final argument is that even if punitive damages are appropriate, the award of $150,000 in punitive damages is excessive and should be reduced.  In Rubinstein v. Administrators of the Tulane Educational Fund, 218 F.3d 392, 407-08 (5th Cir. 2000), the court utilized the three-factor approach taken by the original panel opinion in Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 156 F.3d 581 (5th Cir. 1998), vacated, Williams v. Wal-Mart Stores, Inc., 169 F.3d 215 (5th Cir.), partially reinstated on rehearing, Williams v. Wal-Mart Stores, Inc., 182 F.3d 333 (5th Cir. 1999).  The first factor is the degree of reprehensibility of the defendant's conduct.  See Rubinstein, 218 F.3d at 408.  The second factor is "'whether the punitive damages bear a reasonable relationship to the compensatory damages awarded.'"  Id. (quoting Deffenbaugh-Williams, 156 F.3d at 597.) Finally, for the third factor, we "compar[e] the award in this

case to comparable cases." Deffenbaugh-Williams, 156 F.3d at 598.

However, we note further that:

> "[w]e do not reverse a jury verdict for excessiveness except on 'the strongest of showings.' The jury's award is not to be disturbed unless it is entirely disproportionate to the injury sustained. We have expressed the extent of distortion that warrants intervention by requiring such awards to be so large as to 'shock the judicial conscience,' 'so gross or inordinately large as to be contrary to right reason,' so exaggerated as to indicate 'bias, passion, prejudice, corruption, or other improper motive,' or as 'clearly exceed[ing] that amount that any reasonable man could feel the claimant is entitled to.'"

Deffenbaugh-Williams, 156 F.3d at 597 (second alteration in original)(quoting Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 784 (5th Cir. 1983)).

Regarding the first factor, a jury could find that the evidence presented to it reveals a sufficient degree of reprehensibility to justify a $150,000 punitive damages claim. Irvine was passed over for promotion and effectively demoted in favor of less-qualified males. Her complaints to Human Resources did not produce effective remedial action. She was subjected to demeaning and abusive behavior from her supervisor. Finally, Irvine lived in fear of physical retribution from Scott. These stresses produced serious health consequences requiring Irvine to seek medical attention. Such verbal and physical abuse is precisely the kind of behavior that illustrates a high degree of

reprehensibility.  See <u>Deffenbaugh-Williams</u>, 156 F.3d at 597; <u>Patterson v. P.H.P. Healthcare Corp.</u>, 90 F.3d 927, 943 (5th Cir. 1996).

Similarly, that the punitive award of $150,000 is five times the compensatory award of $30,000 does not compel a remittitur.  "As noted, the type [of] harm inflicted or caused is a primary consideration in determining whether the ratio is acceptable."  <u>Deffenbaugh-Williams</u>, 156 F.3d at 597-98.  In <u>Deffenbaugh-Williams</u>, this court noted that the fact that a punitive damage award was 5.26 times the compensatory damage amount did not, standing on its own, compel a remittitur.  See <u>id.</u> at 598.  We agree.

Finally, we compare the $150,000 award of punitive damages case with the $75,000 award, after remittitur, in <u>Deffenbaugh-Williams</u>.  The evidence supports significantly more reprehensible behavior in this case than the "limited evidence of ill will" found in <u>Deffenbaugh-Williams</u>.  See 156 F.3d at 597.  Therefore, we do not find that the punitive damage award of $150,000 shocks the judicial conscience to such an extent that a remittitur is required.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

25